NATIONAL HELIUM CORPORATION,
Plaintiff,

and

Phillips Petroleum Company

and

Cities Service Helex, Inc., Intervenors-
Plaintiffs,

v.

Rogers C. B. MORTON, Secretary of the
Interior, and Elburt F. Osborn, Direc-
tor, Bureau of Mines, Department of
the Interior, Defendants.

Civ. A. No. W-4568.

United States District Court,
D. Kansas.

March 27, 1971.

Emmet A. Blaes, of Jochems, Sargent & Blaes, Wichita, Kan., Harvey G. Sherzer, Herbert L. Fenster, Robert L. Ackerly, of Sellers, Conner & Cuneo, Washington, D. C., Wendell J. Doggett, Houston, Tex., Gen. Counsel and Secretary, National Helium Corp., for plaintiff.

Ferd E. Evans, Jr., of Morris, Laing, Evans & Brock, Wichita, Kan., William H. Allen, of Covington & Burling, Washington, D. C., R. Price Howard, Asst. Gen. Atty., Phillips Petroleum Co., Bartlesville, Okl., for Phillips Petroleum Co.

Jack W. Wertz, George E. Peabody, Oklahoma City, Okl., Mark H. Adams, Mark H. Adams II, of Adams, Jones, Robinson & Manka, Wichita, Kan., for Cities Service Helex, Inc.

L. Patrick Gray, III, Asst. Atty. Gen., Harland F. Leathers, Stuart E. Schiffer, Attys., Dept. of Justice, Washington, D. C., Robert J. Roth, U. S. Atty., E. Edward Johnson, Asst. U. S. Atty., Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

THEIS, District Judge.

On March 17, 1971, National Helium Corporation filed the instant action against the defendants, Rogers C. B. Morton, Secretary of the Interior, and Elburt F. Osborn, Director of the Bureau of Mines, Department of the Interior. In its complaint National Helium Corporation seeks judicial review of certain actions of the defendants and declaratory and injunctive relief against the defendants. Since the original complaint was filed, Phillips Petroleum Company and Cities Service Helex, Inc. were allowed to intervene as parties plaintiff. They seek identical relief. All of the plaintiffs have requested this Court to issue a temporary injunction pending final disposition of the cause. A hearing was held on March 25, 1971, to determine whether interim relief in the form of a temporary injunction was warranted. For reasons appearing more fully herein, this relief must be either granted or denied before Sunday, March 28, 1971. This decision calls into question the National Helium Act, 50 U.S.C. § 167 et seq., the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. Virtually the entire national program of helium conservation under the National Helium Act is involved.

### FACTS

Plaintiffs are each engaged in helium extraction operations in the Kansas-Hugoton gas field in southwest Kansas. This field is apparently the greatest source of helium in the free world. Helium extraction is a highly technical and complicated operation whereby the helium is extracted from natural gas prior to the gas being sold as a fuel source.

Pursuant to the National Helium Act the plaintiffs were awarded contracts for the extraction and sale of helium to the Federal Government. The contracts provided in part as follows:

"12.1 Buyer [Federal Government] may, at its option, terminate this contract at any time if, (1) in the opinion of the Secretary of the Interior, the discovery of large new helium resources or a substantial diminution in helium requirements or any circumstance of similar nature should occur which would make the continued operation of Seller's plant and the

continued purchase of helium-gas mixture extracted therein unnecessary to accomplish the purposes of the Act or any amendment thereto, or (2) a material circumstance of force majeure making it impracticable or impossible for either Buyer or Seller to carry out its obligations under this contract which circumstance cannot be remedied with reasonable dispatch."

On January 26, 1971, the Department of the Interior, through its then Under Secretary, Fred J. Russell, advised the National Helium Corporation that, pursuant to the termination clause of the helium contract, the contract would be terminated, effective sixty days from January 26, 1971. Enclosed with the termination notice was a statement of the reasons for the termination. The substance of the statement was that all four of the helium conservation contracts were being terminated since the continued operation of the contractors' plants and the continued purchase of the helium-gas mixture extracted in such plants was unnecessary to accomplish the purposes of the Helium Act. The statement cited, as factors underlying the decision to terminate the contracts, a substantial diminution in the requirements of helium for essential government activities, the discovery of new helium resources that had been made since the contracts were entered into, and the availability of helium within economic limits because of improved technology from natural gases which would previously have been impractical because of their low helium content.

By letter of February 19, 1971, from the president of National Helium Corporation, Mr. J. F. McElhatton, to the Honorable Rogers C. B. Morton, Secretary of the Interior, National Helium stated its position that "proper grounds for termination do not exist and that procedural steps necessarily precedent to termination have not been taken."

On March 11, 1971, the defendant Morton, Secretary of the Interior, advised National Helium that the .decision was final and would be effective March 28, 1971. The plaintiffs seek review of this action and injunctive relief preventing the contract termination until the defendants comply with the Administrative Procedure Act, the National Helium Act, and the National Environmental Policy Act. They also seek a temporary injunction pending this Court's review of the action of the defendants, which is alleged to be arbitrary and capricious.

## JURISDICTION

Before this Court can determine whether the plaintiffs are entitled to a preliminary injunction, it must be determined that they have the right of judicial review of the Secretary's action in terminating the contract in question. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, March 2, 1971. This Court concludes, for the reasons stated below, that the plaintiffs are entitled to judicial review.

The Helium Act provides in pertinent part as follows:

"(a) For the purpose of conserving, producing, buying, and selling helium, the secretary is authorized—

(1) to acquire by purchase, lease, gift, exchange, or eminent domain, lands or interests therein or options thereon, including but not limited to sites, rights-of-way, and oil or gas leases containing obligations to pay rental in advance or damages arising out of the use and operation of such properties * * *

(2) to make just and reasonable contracts and agreements for the acquisition, processing, transportation, or conservation of helium * * *."

50 U.S.C. § 167a.

\* \* \* \* \* \*

"(a) The provisions of the Administrative Procedure Act of June 11, 1946, as amended, shall apply to any agency proceeding and any agency action taken under this chapter * * * and the terms 'agency proceeding' and

'agency action' shall have the meaning specified in the Administrative Procedure Act."

50 U.S.C. § 167h.

The Administrative Procedure Act defines "agency action" as "an agency, rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551. That Act also provides that a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. As recently stated by the Supreme Court in Citizens to Preserve Overton Park, Inc. v. Volpe, supra:

"5 U.S.C. § 701 (Supp. V.), provides that the action of 'each authority of the Government of the United States' * * * is subject to judicial review except where there is a statutory prohibition on review or where 'agency action is committed to agency discretion by law.' "

■ The Secretary's acts in the case at bar do not fall within the exception for action "committed to agency discretion." This is a very narrow exception and not applicable to this case for the reason that there is "law to apply" in the Helium Act itself. Only where there is no "law to apply," due to the fact that the statute conferring the authority upon the Secretary is extremely broad, will this exception preclude judicial review.

As was the situation in *Overton Park*, there is no indication of Congressional prohibition of judicial review and no showing has been made that Congress intended to restrict access to judicial review. See Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). As stated by the Supreme Court in that case:

"The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." Id., p. 140, 87 S.Ct. p. 1510.

The availability of judicial review to one suffering a legal wrong as a result of agency action is presumed.

■ The defendants argue that the case at bar does not involve an "agency action," but rather, an action taken pursuant to a valid contract. Although many acts may be done pursuant to a contract which do not amount to "agency action" within the meaning of the Administrative Procedure Act, and for which no judicial review would be available, the Secretary's actions in the present case are clearly "agency actions" and may be tantamount to an absolute frustration of the purposes set forth in the Helium Act. The Court is cognizant of the fact that the Secretary has the authority to implement such a policy decision, but not without first demonstrating that his actions are in fact the implementation of Congressional policy and are not an arbitrary and capricious act, nor imposed without observance of procedural requirements. Similar situations have been held justiciable under the present Chief Justice Burger's opinion in Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964), and the recent cases of Air Reduction Co. v. Hickel, 137 U.S.App.D.C. 24, 420 F.2d 592 (1969) and Scanwell Laboratories, Inc. v. Shaffer, discussed infra.

■ Defendants argue that under the legal doctrine of immunity of the sovereign, this Court has no power to act. However, what has been said concerning applicability of the Administrative Procedure Act nullifies this contention. A long line of well-reasoned cases now hold that the Administrative Procedure Act, where applicable, serves as a waiver of sovereign immunity.

An additional very valid reason entitles the plaintiffs to judicial review. That ground is the recently enacted National Environmental Policy Act of 1969 (NEPA). 42 U.S.C. § 4321 et seq.

■ The purpose of the NEPA is to "declare a national policy which will en-

courage productive and enjoyable harmony between man and his environment * * *." 42 U.S.C. § 4321. Congress specifically stated in its declaration of environmental policy that *"resource exploitation"* was a factor in declaring that the national policy is *"to use all practicable means and measures"* to promote, create and maintain conditions under which man and nature can exist in productive harmony and fulfill the requirements of present and future generations of Americans. 42 U.S.C. § 4331 (emphasis added).

Section 4331 also provides that in order to carry out this policy it is the continuing responsibility of the federal government to use "all practicable means" to the end that this nation may:

"(5) achieve a balance between population and *resource use* which will permit high standards of living and * *

(6) enhance the quality of renewable resources and *approach the maximum attainable recycling of depletable resources."* Id.

(Emphasis added.)

In 42 U.S.C. § 4332, Congress directs, to the fullest extent possible, that the policies, regulations and laws of the United States be interpreted and administered in accordance with these policies. This section also states that all agencies of the federal government *shall*:

"(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided in Section 552 of Title 5, and shall *accompany* the proposal through the existing agency review processes;

(D) study, develop and describe appropriate alternatives to recommended *courses of action in any proposal* which involves unresolved conflicts concerning alternative uses of available resources;

(E) recognize the worldwide and *long-range character of environmental* problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives,

resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(F) make available to States, counties, municipalities, institutions, · and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(G) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(H) assist the Council on Environmental Quality established by subchapter II of this chapter."

The National Environmental Policy Act has been implemented by Executive Order 11514, signed by the President on March 5, 1970, and directs federal agencies to develop procedures for implementing and enforcing the Act. Pursuant to the Act and this Executive Order, the Department of Interior adopted procedures effective September 17, 1970. Part 516 of the Department of Interior. Departmental Manual directs that all Public Laws of the United States administered under the agency jurisdiction should be interpreted and administered in accordance with policies set forth in the National Environmental Policy Act of 1969. Such procedures are made applicable to continuing major federal actions having a significant effect on the environment, even though arising from projects initiated prior to enactment of the Act. The procedures further direct that an environmental statement shall be submitted to the Council on Environmental Quality on all major actions proposed by the Department which would have a significant effect on the quality of environment. The Department procedures also contemplate public hearings on proposed agency actions with notice of such hearings to include publication in the Federal Register no less than thirty days before the hearing date. Further, the Council on Environmental Quality established by NEPA has issued guidelines for statements on proposed federal actions affecting the environment. 33 Fed.Reg. 1398 (Jan. 22, 1971). These guidelines provide for the preparation of environmental statements on major federal actions significantly affecting the quality of the human environment, and directing all federal agencies, to the fullest extent possible, to direct their policies, plans and programs so as to meet national environmental goals. These guidelines provide in relevant part:

"The objective of section 102(2) (c) of the Act and of these guidelines is to build into the agency decision making process an appropriate and careful consideration of the environmental aspects of proposed action and to assist agencies in implementing not only the letter, but the spirit, of the Act."

■ This Act has recently been interpreted by federal courts, and is held by this Court as nothing less than a mandate to the Secretary in the case at bar, to either follow the prescribed procedure in taking the relevant action or to show that it is not "possible" within the meaning of the NEPA. This Act must be construed in conjunction with the Helium Act, and in so doing, the Court concludes that it appears that the defendants have failed to comply with these Acts and that the plaintiffs have standing to bring this action. See Wilderness Society v. Hickel, 325 F.Supp. 422 (D.D.C. 1970); Environmental Defense Fund v. Corps of Engineers, etc., 324 F.Supp. 878 (D.D.C.1971).

## STANDING

Even though this Court has determined that the plaintiffs are entitled to judicial review of the Secretary's actions, an additional problem now presents itself due to the fact that the plaintiffs seek, in addition to judicial review, equitable relief in the form of preliminary and permanent injunctions. This, in and of itself, would not be particularly difficult if it were not for the fact that the plaintiffs appear to have an adequate remedy at law for damages under the Tucker Act for the alleged breach of the contracts

in question. Hence, the question of standing that has so often troubled the federal courts, now presents itself.

The very recent case of Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App. D.C. 371, 424 F.2d 859 (1970), contains an enlightening history of the nebulous doctrine of standing. In this case Circuit Judge Tamm, speaking for the Court of Appeals, traces the history of this doctrine from the cases of Massachusetts v. Mellon and Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), to the present time. In *Scanwell* the court considered the impact of the Administrative Procedure Act on cases arising in the course of government procurement and held, inter alia, that government contractors have standing to sue in cases similar to the one at bar. In that case the Court held that an unsuccessful bidder for a government contract had standing to sue to allege an illegality in the manner in which the contract was let.

Also in *Scanwell* there was well articulated the "private attorneys general" theory whereby one who feels aggrieved by administrative action has standing in the public interest to see that governmental action is done legally and within the guidelines of due process.

Independent of the private attorneys general theory of standing, Judge Tamm, in the *Scanwell* case, held that Section 10 of the Administrative Procedure Act gives jurisdiction to the federal district courts and standing to government contractors to seek review of arbitrary and capricious agency action, an abuse of discretion, or other illegality.

■ It may seem passing strange to see plaintiffs, the offspring of corporate giants of the oil and gas industry, garbing themselves in the status of private attorneys general for the public interest, yet this Court perceives no valid reason why they cannot assert this role as protector of the public interest, along with their own. The Court finds that plaintiffs do have requisite standing to maintain this action.

## THE TEMPORARY INJUNCTION

■ The Circuit Court of Appeals for the Tenth Circuit has recently stated the well defined legal principles governing this Court in determining whether temporary injunctive relief is appropriate. Crowther v. Seaborg, 415 F.2d 437 (1969). Initially it should be noted that this is a matter directed to the sound discretion of this Court, and that the burden is upon the plaintiffs "to make a prima facie case showing a reasonable probability that [they] will ultimately be entitled to the relief sought." Id. at 439. In addition, the parties seeking the relief must show that in its absence irreparable injury will result.

The Court has previously determined that the National Environmental Policy Act is applicable to the Department of Interior "to the fullest extent possible" in its administration of the Helium Act, as heretofore indicated. No discussion is necessary concerning the obvious importance of the element helium as a natural and depletable resource, and a most valuable asset to this nation. Neither is it a debatable point that helium presently existing in the natural gas resources of the Hugoton Field, underlying the States of Kansas, Oklahoma and Texas, and said to be the world's largest supply of natural gas, will be irretrievably lost in the atmosphere if not extracted as a component part of the production of natural gas from that field.

The evidence before the Court, and specifically the supporting statement of the Undersecretary of Interior attached to his letter of termination, contains no reference to the consideration by the Secretary of the application of the National Environmental Policy Act, nor of the Department's own regulations in that area. It would appear that the basis for decision by the Secretary of Interior to terminate these contracts was not based upon a proper or legal administrative foundation, as required by the contracts in question, the Helium Act, and the National Environmental Policy Act. These deficiencies indicate to the Court a probability of success of the plaintiffs

in eventually securing a reevaluation of the termination of the contracts in the light of all the pertinent national policy considerations.

While a determination of the probability of success as a basis for the issuance of an injunction is, as this Court views it, an ephemeral and elusive one, requiring somewhat the entrance of the Court into the administrative process from which it states it will refrain, the Court makes such a determination.

Moving to the next step necessary as a prerequisite to injunction, the Court believes that a present evidentiary basis exists for irreparable injury to the plaintiffs and the public interest if such contracts are immediately and summarily terminated as of 8:00 a. m. Sunday, March 28, 1971. This finding of irreparable harm is based on the evidence before the Court in the form of affidavits and the apparent admission just this week by officials of the Department of Interior at a hearing before the Senate Subcommittee on Minerals, Materials, and Fuels, of the Committee on Interior and Insular Affairs, that relevant inquiry and consideration was not given to the effect of the decision to cancel the helium contracts in the light of the National Environmental Policy Act. The conclusion reached by the Undersecretary of the Interior in his statement of January 26, 1971, supporting the proposed termination of the production and storage contracts before the Court, is not supported by sufficient findings and determinations to permit adequate judicial review of the correctness of these determinations in a preliminary hearing, and the status quo should be maintained pending a hearing before the Court on the merits of the action or, in lieu thereof, a reconsideration by the Department of Interior of its action in the light of applicable substantive and procedural due process requirements. Preliminary injunction should issue to prevent the proposed termination of the contracts which are the subject matter of this action. Such action will not unduly inconvenience the defendants, since the helium produced during the interim period shall be purchased pursuant to existing contract terms and will be stored in the underground storage facility at Amarillo, Texas.

It is hereby ordered, this 27th day of March, 1971:

That the defendants, their agents and employees, are temporarily enjoined from taking any action leading to the termination of the National Helium Program and the implementing Contracts No. 14–09–0060–2429, No. 14–09–0060–2434, and No. 14–09–0060–2424, and it is further ordered that such contracts shall be continued and remain in full force and effect pending further order of this Court;

Provided that plaintiffs give security in the sum of $75,000.00 for the payment of such costs and damages as may be incurred by defendants if they are found to have been wrongfully restrained, such security to be in the form of a Certified Check or a Bond approved by the Clerk of the Court.