**CITIES SERVICE HELEX, INC.**

v.

**The UNITED STATES.**

**NATIONAL HELIUM CORPORATION**

v.

**The UNITED STATES.**

**Nos. 138–75, 158–75.**

United States Court of Claims.

Oct. 20, 1976.

Charles C. Baker, Shawnee, Okl., atty. of record, for Cities Service Helex, Inc. James M. Sturdivant and C. A. Coulter, Tulsa, Okl., of counsel.

Robert L. Ackerly, Washington, D. C., atty. of record, for National Helium Corp. Raymond S. E. Pushkar, Harvey G. Sherzer, D. Joe Smith, Jr., Sellers, Conner & Cuneo, Washington, D. C., and Wendell J. Dogget, of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant. John D. Trezise, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges, en banc.

## ON DEFENDANT'S AND PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT

DAVIS, Judge:

In 1960 Congress enacted Helium Act Amendments giving the Secretary of the Interior broad authority to establish a long-range helium conservation program. Four 22-year contracts providing for the Government's purchase of helium from private contractors formed the major components of this program. The court considered one of those contracts, and that contractor's claim of material breach, in *Northern Helex Co. v. United States,* 455 F.2d 546, 197 Ct.Cl. 118 (1972), and 524 F.2d 707, 207 Ct.Cl. 862 (1975), *cert. denied,* —— U.S.

——, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976).[1] Two of the other three contractors are now before us challenging certain government termination actions and nonpayment that occurred after the material breach for which Northern Helex brought suit.[2] However, only part of these two cases is to be decided at this time. Whatever our ruling, much remains to be litigated.

### No. 158–75, National Helium Corp.

National Helium was one of the four helium conservation contractors. Its 1961 agreement required it to construct a helium extraction facility and to tender to the Government the helium produced, and in turn called upon the Government to pay for all helium tendered, up to an annual maximum of $15,200,000.[3] This contract, like the other three, permitted termination prior to the end of the 22-year term only on specified grounds; the Government was given no general right to terminate for its own convenience.

On January 26, 1971, Under Secretary of the Interior Russell issued to each of the four helium contractors a 60-day notice of termination, accompanied by a statement of reasons, said to be pursuant to the contract's termination provision. National Helium's president responded with a letter of February 19, 1971, declaring that "we are unable to agree that the purported termination is valid," "respectfully suggest[ing] that [the] determinations and the purported termination are ineffective," and urging Secretary of the Interior Morton "to remove the cloud of the purported termination notice by officially withdrawing the same." On March 11, Secretary Morton replied that the decision to terminate was final and would take effect on March 28. On March 17, National Helium filed suit challenging the action in federal district court in Kansas.[4] *See National Helium Corp. v. Morton,* 326 F.Supp. 151, 152 (D.Kan.), *aff'd* 455 F.2d 650 (10th Cir. 1971).

The District Court complaint charged that the termination and the statement of reasons were "factually erroneous, arbitrary and capricious, an abuse of discretion, and otherwise illegal and contrary to the purposes and requirements of the National Helium Act, as amended, the National Environmental Policy Act of 1969 [NEPA], and the Administrative Procedure Act."[5] National Helium prayed for an injunction prohibiting the Government from terminating its contract, and the helium program, without first holding public hearings and for a declaration that the Russell termination was invalid and that the contract remained in full force and effect "unless and until the defendants terminate the contract in full compliance with the terms of the contract, the provisions of the 1960 Amendments to the National Helium Act, the National Environmental Policy Act of 1969, and the Administrative Procedure Act."[6]

1. The *Northern Helex* opinions contain more detailed descriptions of the helium conservation program. *See also Northern Natural Gas Co. v. Grounds,* 292 F.Supp. 619, 646–59 (D.Kan.1968), *modified,* 441 F.2d 704 (10th Cir.), *cert. denied,* 404 U.S. 951, 92 S.Ct. 268, 30 L.Ed.2d 267 (1971); 404 U.S. 1063, 92 S.Ct. 732, 30 L.Ed.2d 751 (1972); *National Helium Corp. v. Morton,* 361 F.Supp. 78, 83–88 (D.Kan.), *rev'd,* 486 F.2d 995 (10th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

2. Because the facts and issues raised by the two present plaintiffs are virtually identical, the cases were argued in tandem and are decided together.

3. The contract gave the Government the option to purchase helium in excess of this annual maximum. During the years here involved, the Government declined to exercise this option.

4. Two other helium contractors, plaintiff Cities Service Helex and Phillips Petroleum, subsequently joined National Helium. The fourth contractor, Northern Helex, had filed suit in the Court of Claims before the Russell termination and did not participate in the District Court suit challenging it. *See Northern Helex Co. v. United States, supra.*

5. In paragraph 22 of the petition, National Helium specifically averred that the court could review, under section 10 of the APA, the contractual validity of the Russell termination.

6. In a letter dated July 20, 1971, after the District Court's initial decision, National Helium reiterated what it described as its litigation position that the Russell termination was "ineffective."

On March 27, 1971, one day before the operative date of the Russell termination, the District Court temporarily enjoined the Government from taking any action leading to the termination of the helium program and the contracts, and ordered that the contracts remain in full force and effect pending further court order. *National Helium Corp. v. Morton,* 326 F.Supp. 151, 158 (D.Kan.1971). The Government appealed but the Tenth Circuit affirmed on the ground that the injunction was proper because of the Government's failure to comply with NEPA. *National Helium Corp. v. Morton,* 455 F.2d 650, 653–54, 657 (10th Cir. 1971).[7]

In May 1972 a draft environmental impact statement was ready for comment and announced in the Federal Register. The final statement was issued in November 1972. In December, the Government moved to dissolve the injunction. As summarized in the District Court's mid-January order denying that motion, the Government informed the court that all necessary legal and administrative steps for proper termination had been completed but that the Government thought the injunction precluded it from terminating the contract. Explaining that the injunction had affected only the actions previously before the court and was not intended to restrict subsequent administrative action, the District Court ruled that the motion was premature because the sufficiency of the Government's actions would not be justiciable until the Government actually decided to terminate. On February 2, 1973, Secretary Morton issued the termination notice and statement of reasons referred to as the Morton termination, to be effective April 4, 1973. The Morton termination purported to stand on its own feet but also referred to the reasons for the Russell termination as sound.

The Government then renewed its motion to dissolve the injunction, which the District Court again denied. The Government appealed. The Tenth Circuit declined to rule on the appeal at that stage but noted that the District Court's review of the impact statement should be on the basis of the administrative record, not by trial de novo, and remanded for trial "forthwith" on the propriety of the environmental impact statement.[8] In June 1973 the District Court found the impact statement inadequate and continued the injunction. *National Helium Corp. v. Morton,* 361 F.Supp. 78, 97–108 (D.Kan.1973). The Tenth Circuit, in October 1973, reversed, finding the impact statement to be sufficient, and remanded with directions to dismiss the action. *National Helium Corp. v. Morton,* 486 F.2d 995 (10th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

By letter of November 2, 1973, the Acting Secretary of the Interior informed National Helium that, according to official advice, the Tenth Circuit's mandate was to issue on November 12 and the Government planned on that date to shut in the pipeline through which it received plaintiff's helium, unless the company wished to deliver helium for storage for its own account. Plaintiff answered on November 7 that it had no desire to deliver helium for its own account, that the prior termination notices had expired, and that it would regard the closing of the pipeline "as an act of material breach of contract." The Government did close the pipeline on November 12 and accepted no helium thereafter. The injunction was dissolved and the case dismissed by the District Court on November 19. The dismissal order was entered "[i]n accordance with the mandate of the Court of Appeals filed herein on November 13, 1973, and that Court's

---

7. The circuit court made clear that it viewed the contractual validity of the termination as beyond the scope of the court's review and rested its affirmation on NEPA. *Id. See also National Helium Corp. v. Morton,* 486 F.2d 995, 1000 (10th Cir. 1973), *cert. denied,* 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974).

8. The Court of Appeals expressly retained the issue of the continuing validity of the preliminary injunction.

directive that the decision to terminate should be carried out without delay."

Until November 12, through almost the entire life of the injunction and the District Court suit, the plaintiff tendered and the Government accepted helium, though because of lack of appropriations the Government did not pay for helium delivered after the end of June 1972 (despite plaintiff's submission of regular invoices showing the amounts claimed to be due under the contract).

Plaintiff filed suit here a year and a half later, on May 12, 1975. In the first of three counts, it claims entitlement to the contract price, plus interest as provided by the contract, for helium delivered and tendered from July 1, 1972, through November 19, 1973, the date of the District Court's dissolution of the injunction. Count two seeks damages (based on the Government's maximum annual obligation and quantity of helium to be delivered to the end of the contract term in 1983) for the Government's material breach of failing to pay for helium delivered and tendered from July 1972 to November 1973. The damages requested in count three are the same as those in count two; however, the material breach stated is the "[t]ermination action effected by virtue of such notices [the allegedly invalid Russell and Morton termination notices] and by defendant's subsequent closing of the valve and shut-in of the pipeline." The amount sought is $171,572,603.20, plus contract interest on a portion, less any operational cost savings resulting from the cessation of helium operations.

*No. 138–75, Cities Service Helex, Inc.*[9]

Cities Service's 1961 helium conservation contract with the Government, which carried a somewhat lower annual ceiling on the Government's obligation than National Helium's ($9,100,000 per fiscal year compared to National Helium's $15,200,000),[10] was one of the contracts covered by the Russell termination of January 26, 1971. The president of Cities Service protested by letter of February 19, 1971, that that action was "based on erroneous facts," "contrary to the national interest," and "defective."[11] Cities Service urged Secretary Morton to rescind the notice and "reserve[d] its rights to pursue its legal remedies in this matter." After receiving Secretary Morton's March 11 affirmation of the decision to terminate, the company joined National Helium's District Court suit.

Cities Service's complaint as plaintiff-intervenor closely paralleled National Helium's pleading and requested a preliminary injunction, and either a permanent injunction, or a declaration (a) of the invalidity of the Russell termination and (b) of the continued force of the contract. After the District Court granted the preliminary injunction, Cities Service wrote again to government officials: "It is the position of Cities Service Helex, Inc. that the contract remains in force and effect." Subsequently, as already pointed out, the Tenth Circuit affirmed the issuance of the preliminary injunction.

Events proceeded as they did in *National Helium, supra.* The Government took steps to comply with NEPA, tried to have the injunction dissolved, issued the Morton termination notice, and continued its litigation efforts, which were finally successful in October 1973, when the Court of Appeals held the environmental impact statement adequate and remanded to the District Court for dissolution of the injunction and for dismissal. Also as in *National Helium,* the

---

**9.** The significant facts of this case can be stated more briefly because most are shared with *National Helium* and have already been detailed.

**10.** This contract, too, gave the Government the option to purchase amounts in excess of the annual limitation, an option which the Government declined to exercise during the pertinent years.

**11.** In a letter dated March 3, 1971, directing several questions to Secretary Morton, the Cities Service president again stated the company's position that the termination notice was invalid and any basis for termination nonexistent.

plaintiff continuously tendered helium and the Government accepted it until November 12, 1973, but the Government paid only for the helium delivered through June 1972. By letter of November 9, 1973, Cities Service reacted to the Government's November 2 notice of intent to shut the pipeline as follows: "You are advised that your stated intention to 'shut-in the pipeline' * * * constitutes a material breach of contract and that appropriate action for damages for such breach will be instituted if you persist in such action." The Government closed the pipeline on November 12; the Circuit's mandate issued on November 13; and the District Court dissolved the injunction and dismissed the suit on November 19, 1973.

Cities Service filed its petition here on April 24, 1975. It sets forth two causes of action, one alleging breaches of contract and the other seeking indemnification for amounts it may have to pay to third parties. Only segments of the first cause concern us now. In it, Cities Service delineates four material breaches: the Russell termination of January 1971; the Government's non-payment for helium delivered from July 1972 through November 12, 1973; the Morton termination of February 1973; and the shut-in of the pipeline on November 12. Plaintiff seeks a total of $101,557,041.51, with adjustment for interest as provided by the contract and discounted to present value but without adjustment for operational cost savings; Cities Service claims that, because its facility is an integrated one which it cannot cease to operate, it can achieve no cost savings to be deducted.

I

*The Government's Motions for Partial Summary Judgment*

In each case the Government has moved for *partial* summary judgment to preclude the plaintiff from litigating, as independent material breaches ending the contract, any actions by the Government antedating the Morton termination (February–April 1973).

The Government asks us to dismiss the petitions to the extent that they state claims of total breach prior to that termination. The plaintiffs oppose but have not cross-moved on this aspect of the cases.

A.

This statement of the requested relief suggests a threshold hurdle. We are not sure that the Government has stated proper motions for partial summary judgment.[12] The court has recently stressed that it disapproves the use (before pre-trial) of partial summary judgment motions to dismiss segments of claims in order to narrow issues and limit discovery. *Decca Ltd. v. United States,* 204 Ct.Cl. 907 (1974). Yet the Government may be trying to so use its motions here, at least to some extent. Granting of the motions will not result in the dismissal of either petition as a whole, or of any entire cause of action. It is difficult to find specific claims that will be dismissed as a whole; Cities Service states only one alleged material breach completely antedating the Morton termination, and National Helium alleges no pre-Morton-termination material breach as a separate claim.[13] Further, the Government's papers indicate some interest in using summary judgment as an evidentiary tool when it describes its difficulties in resisting discovery of documents relating to the Russell termination and urges the court to issue, with its decision on the summary judgment motions, guidelines limiting proof addressed to the Russell termination. However, at oral argument government counsel disavowed any effort to use the present motions to obtain direct rulings on discovery matters or on the relationship, if any, between the Russell and Morton terminations. We reemphasize the views expressed in *Decca Ltd., supra,* but have decided in these circumstances to pass on the merits of the motions. The parties have fully briefed and argued the relatively narrow legal questions presented, the resolution of which

---

12. Plaintiffs deny that the motions are proper.

13. In its petition, National Helium groups the two termination notices and the shut-in of the pipeline as one material breach claim.

does not in our view call for further factual ventilation, and which will probably clarify the issues on which the further proceedings must focus. It may well save time and effort, and avoid undue complexity, to confront at this time, instead of by-passing, the problems raised by the defendant's motion.

### B.

■ The Government's arguments are suggestive of waiver, election of remedies, and estoppel;[14] the thrust of the motions is that the plaintiffs cannot now litigate pre-Morton-termination actions as material breaches ending the contracts because they insisted on treating, and that the Government treat, their contracts as in full force and effect until long after the Morton termination—and thereby affirmatively kept the contracts and the Government's contractual right to terminate alive to the time of that termination. The plaintiffs counter that the Government had materially breached, and thereby ended, the contracts before the Morton termination so that the Government's right to terminate no longer existed in February–April 1973.[15]

■ A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.[16] *See generally* 5 S. Williston, Contracts §§ 683–88 (3d ed. W. Jaeger 1961); Restatement of Contracts §§ 317, 309–10 (1932); 17 Am. Jur.2d *Contracts* §§ 446–47, 489, 503, 510 (1964); *Acme Process Equip. Co. v. United States,* 347 F.2d 509, 515–16, 171 Ct.Cl. 324, 334–37 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966); *Airco, Inc. v. United States,* 504 F.2d 1133, 1135–37, 205 Ct.Cl. 493, 497–99 (1974); *DeVito v. United States,* 413 F.2d 1147, 1153–54, 188 Ct.Cl. 979, 990–91 (1969); *Ling-Temco-Vought, Inc. v. United States,* 475 F.2d 630, 636–39, 201 Ct.Cl. 135, 144–50 (1973); *Northern Helex Co. v. United States,* 455 F.2d 546, 551, 197 Ct.Cl. 118, 125–26 (1972).

■ Under strict formulations of the election doctrine, any act indicating an intent to continue the contract is an election, and election to continue may occur simply by failure of the injured party to take action to end the agreement within a reasonable time after becoming aware of the facts. Under that view, if performance continues and is accepted, the right to end the contract cannot be preserved even by explicit expression of intent; any inconsistent act

---

14. As noted by the plaintiffs, the Government does not very explicitly label its theory. However, the courts and commentators have been similarly lax and imprecise in this area, so we cannot view the Government's failing with great alarm. One problem might be the Government's failure to plead waiver, election, or estoppel as an affirmative defense. However, since the plaintiffs have ably and thoroughly responded to the Government's arguments, showing no prejudice from the injection of the issue at this stage, and all parties have exhaustively treated it, we will consider the defense on the merits. *Cf.* Ct.Cl. R. 39(b); *Erickson v. United States,* 309 F.2d 760, 764, 159 Ct.Cl. 202, 210 (1962).

15. If the plaintiffs may litigate pre-Morton-termination actions as independent material breaches and those acts are determined to have been material breaches ending the contracts, plaintiffs will be entitled to contract damages to the end of the contract terms in 1983, regardless of whether contract grounds for termination existed in 1973 when the Morton termination issued. If, however, they are barred from treating those prior acts as material breaches ending the contracts, the validity and effectiveness of the Morton termination—under the contract—will have to be decided. The plaintiffs will be entitled to contract damages to 1983 only if the Morton termination (followed by the shutting of the pipeline) is found to have been invalid or ineffective.

16. An election to continue the contract is frequently called a waiver of the material breach.

results in the loss of the right, unless the other party assents to its retention by the aggrieved party.[17] 5 S. Williston, *supra,* §§ 683–85;[18] 17 Am.Jur.2d, *supra,* §§ 447, 510. The continued acceptance of benefits under the contract is the most common and clearest case of election by conduct. *See* 5 S. Williston, *supra,* § 687; 17 Am.Jur.2d, *supra,* §§ 447, 489.

As the plaintiffs stress, some courts and commentators and the Uniform Commercial Code have modified various aspects of this strict view. In *Northern Helex Co. v. United States,* 455 F.2d 546, 197 Ct.Cl. 118 (1972), the court adopted the position that the injured party may itself continue performance in certain circumstances and yet reserve its right to claim material breach without the breaching party's assent. *Id.* at 553, 197 Ct.Cl. at 129–30; *see* Uniform Commercial Code § 1–207. Some courts have shared Professor Corbin's view that an election should not be conclusive unless facts giving rise to an estoppel exist; either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position. 5A A. Corbin, Contracts § 1220 (1964); *Western Transmission Corp. v. Colorado Mainline, Inc.,* 376 F.2d 470, 472 (10th Cir. 1967); *see United States v. Chichester,* 312 F.2d 275, 282 (9th Cir. 1963); 5 S. Williston, *supra,* § 686, at 289–91; *cf. Ling-Temco-Vought, Inc. v. United States, supra* at 636–37, 201

Ct.Cl. at 145–46 (court stressed extra expense incurred by Government); *DeVito v. United States, supra* (elements of waiver of default in delivery include reliance and continued performance of delinquent party). The authors of the Uniform Commercial Code have also rejected the mechanical application of the doctrine of election of remedies: "Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case." Uniform Commercial Code § 2–703, Comment 1.

### C.

■ Under any of these theories, the plaintiffs must be deemed to have elected to continue, not to end, their contracts, at least to the time of the Morton termination.

1. Clearly under the strict election doctrine, they kept the contracts and all obligations and rights under them alive until after that government termination. Not only did they fail to take any action or make any statement to end the contracts before that time,[19] but they also continued their own performance, insisted on continued government performance, and accepted that government performance.[20] Above all, in response to the proposed Russell termination, they promptly sued in the District Court to have the contracts declared in full force and effect because of the contractual invalidity of that termination as well as to have that termination enjoined pending compliance with NEPA and other statutes. They specifically sought to force the

---

17. This strict view was probably born of the courts' distaste for forfeiture and the harshness of cancellation, and the belief that cancellation had to meet the strictest requirements of fairness and timeliness. *Cf. Acme Process Equip. Co. v. United States, supra; H. N. Bailey & Associates v. United States,* 449 F.2d 387, 391, 196 Ct.Cl. 156, 163–64 (1971).

18. Professor Williston would not condition cancellation on the injured party's knowledge of the facts if the circumstances have materially changed or the breaching party has justifiably changed his position in reliance on the aggrieved party's inaction. *Id.* § 685.

19. It should be emphasized that all of plaintiffs' pre-Morton characterizations of the Russell termination stressed that it was invalid and inef-

fective, *i. e.,* that it should be disregarded as inoperative. Insofar as plaintiffs may have implied that that termination amounted to a breach of contract, they never said or implied that it was a material breach ending the entire contract. They were content, indeed insisted, that the remedy be the disregarding of the Russell termination and the continuance of the contract. *See also* note 22, *infra.*

20. They accepted full government performance, including payment, with respect to helium delivered prior to July 1972, and demanded full performance, by submitting regular bills for amounts due under the contract, with respect to helium delivered and accepted but not paid for by the Government after July 1, 1972.

Government to continue performance and succeeded in that effort.[21] Every action taken by plaintiffs, until the Government threatened to and did shut in the pipelines, was directed toward keeping the contracts fully alive—and they prevailed in that effort with the help of the District Court. Only after the Government gave notice of its intent to close the pipeline valves in November 1973, nine months after the Morton notice (February 1973), did the plaintiffs openly claim material breach.[22]

On these facts the cases fit squarely within this court's prior decisions holding that a contract—and the Government's right to terminate—remains in effect, regardless of any prior breach by the Government, where the contractor fails to put an end to the contract for government breach before the Government exercises its right to terminate. *Airco, Inc. v. United States,* 504 F.2d 1133, 1136–37, 205 Ct.Cl. 493, 499 (1974); *William Green Constr. Co. v. United States,* 477 F.2d 930, 936, 201 Ct.Cl. 616, 625 (1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2606, 41 L.Ed.2d 213 (1974); *Nolan Bros., Inc. v. United States,* 405 F.2d

1250, 1253, 1255 n. 5, 186 Ct.Cl. 602, 606, 609 n. 5 (1969). The plaintiffs' claims of pre-Morton-termination breaches also fall under our holding in *Acme Process Equip. Co. v. United States,* 347 F.2d 509, 171 Ct.Cl. 324 (1965), *rev'd on other grounds,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), that a right to cancel for material breach must be exercised with reasonable promptness after discovery of the breach. *Id.* at 515, 516, 171 Ct.Cl. at 335, 337; *accord, DeVito v. United States,* 413 F.2d 1147, 1153–54, 188 Ct.Cl. 979, 990–91 (1969); *Airco, Inc. v. United States, supra* at 1135, 205 Ct.Cl. at 497; *cf. Companhia Atlantica v. United States,* 180 F.Supp. 342, 346–47, 148 Ct.Cl. 71, 78, *cert. denied,* 364 U.S. 862, 81 S.Ct. 103, 5 L.Ed.2d 85 (1960) (Government could not awaken a "sleeper," an old material breach on which it had not acted, to justify cancellation made on an improper ground).

2. Even under the modified views of the permissible methods of handling a material breach, these plaintiffs cannot claim that they ended their contracts prior to the Morton termination. The position adopted in *Northern Helex Co. v. United*

---

**21.** The complaints of both plaintiffs in the District Court sought an injunction against the Government's termination of the respective contracts, and a declaration that the contract "remain in full force and effect, preliminarily and permanently," until proper proceedings were held to terminate it in accordance with contractual and statutory requirements.

The District Court, affirmed by the Court of Appeals, ordered that (a) the government defendants were enjoined from taking any action leading to the termination of the National Helium Program "and the implementing Contracts" [giving the numbers of the three contracts involved in that suit, including plaintiffs' contracts] and (b) "that such contracts shall be continued and remain in full force and effect pending further order of this Court." *National Helium Corp. v. Morton, supra,* 326 F.Supp. at 158.

**22.** Even then they claimed material breach only with respect to the closing of the pipeline. Their explicit claims of material breach in the fall of 1973 provide a sharp contrast to their labeling of the Government's earlier termination as "ineffective," and strengthen our interpretation of their prior letters as statements that the contracts remained in effect after those terminations. *See* note 19, *supra.*

Indeed, in one letter written shortly after the District Court injunction first issued, Cities Service stated explicitly that in its view the contract remained in force and effect. Cities Service now argues that we should read this remark in conjunction with the preceding paragraph of the letter noting the injunction; it is said that the remark meant that the contract remained in force and effect only because of the injunction. The letter, however, did appear to separate the two thoughts and paired the "remains in force" statement with the following sentence: "If, however, it is ultimately determined that the termination is effective, * * *." Especially when considered with the plaintiff's previous letters and its District Court complaint (*see* note 21, *supra* ), this "in force and effect" declaration was broader than a statement of the temporary effect of the preliminary injunction. It summarized Cities Service's ultimate position and view of the proper outcome of the litigation. In any event, both Cities Service and National Helium deliberately sought the injunction which kept the contracts fully alive. As discussed *infra,* the contractors must take the necessary consequences of their own chosen course.

*States* 455 F.2d 546, 197 Ct.Cl. 118 (1972), allowed a plaintiff to claim a material, contract-ending, breach—despite having continued performance—only in the context of that plaintiff's explicit reservations of material breach claims, explanations in advance of the reasons for its continued performance, prompt suit before the Government took any action to terminate, the lack of prejudice to the Government, and other special factors. *Id.*; *see Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630, 637, 201 Ct.Cl. 135, 146–47 (1973). These facts, which readily distinguish *Northern Helex* from the present suits, brought Northern Helex within the rule of Uniform Commercial Code section 1–207: "A party who with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not thereby prejudice the rights reserved." *See* 455 F.2d at 552–53, 197 Ct.Cl. at 128–30. In the present case continued performance on both sides for a long period of time and without any explicit warning that claims of material breach would some day be asserted [23] went far beyond the reasonable commercial judgment that we found in *Northern Helex*. *See* 455 F.2d at 553, 197 Ct.Cl. at 129.

Moreover, we have here much more than mere continuance of performance by the injured party, leaving it open to the defaulter whether or not to continue its own performance. Both plaintiffs set out to force the Government to perform fully, and instituted suit in the District Court for that very purpose. In this they succeeded for the entire period with which we are now concerned. The District Court suit, and the order issued by that tribunal (and continued in effect) at plaintiffs' instance, was wholly and directly opposed to their present position that the companies had already put the contracts to an end. The Kansas action sought the polar antithesis of an ending of the contract because of the Russell termination; it asked for the disregarding of that notice and the continuation of the agreement in full force and effect despite the Russell termination. We cannot understand how, after a material breach, the injured contractor can continue its own performance as well as compel the other side to perform, and still, at the same time, claim that it ended the contract upon that material breach. The inconsistency between the actual course of conduct and the verbal claim is too stark. The contemporaneous action belies the hollow words.[24]

**23.** As we have pointed out, neither National Helium nor Cities Service explicitly reserved the right to claim material breach, ending the contract, at any time before November 1973. Cities Service did state in its first letter responding to the Russell termination notice that the company reserved its right to pursue its legal remedies in the matter (without further specification). That reservation was followed almost immediately by plaintiff's participation in the District Court suit and was given meaning by that and other acts, all directed toward continuation of the contract. At least where all of a plaintiff's actions are inconsistent with the reservation of a right to end a contract for material breach, and where plaintiff's express declaration of material breach comes long after the acts complained of and after the parties have both continued performance, a prior general and undifferentiated reservation of rights is insufficient; the reservation must plainly and explicitly assert the right to claim material breach ending the contract, unless adequate warning has otherwise been given. *Cf. Robinson v. Jonathan Logan Financial*, 277 A.2d 115 (D.C.Ct.App.1971) (informing seller that buyer

has problem with shipment is far short of required seasonable notification of rejection); *Ling-Temco-Vought, Inc. v. United States, supra* at 638, 201 Ct.Cl. at 149 (plaintiff's reservation of right to claim material breach would have enabled Government to evaluate and protect its position).

**24.** In actual fact these cases, as we point out, are a fortiori because plaintiffs did not even speak the words of material breach at the time they commenced and carried on the District Court litigation through the second appeal. An analogy may be drawn to the rule of U.C.C. Section 2–611 which declares that, in the case of an anticipatory repudiation, the repudiating party can retract his repudiation "unless the aggrieved party has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final." By pursuing and winning their District Court suit, plaintiffs in effect forced the Government to retract its alleged repudiation (*i. e.* the Russell termination, if considered a repudiation). *See also* notes 25, 34 *infra.*

3. Plaintiffs fare no better under the Corbin view that an election is binding if the breaching party changes his position in reliance, or if the injured party's conduct has been such that it would be unjust to allow him to change. Both conditions exist here. Plaintiffs' course of action in response to the Russell termination caused (i) the Government's continued performance of the contracts despite its own decision to terminate,[25] (ii) the Government's payment of the full contract price for more than a year after the termination was to have taken effect,[26] and (iii) the Government's repetition for the Morton termination of the steps needed to terminate the contract. The plaintiffs accepted the benefits accruing from their chosen course of action [27] and did not suggest to the Government, until long after the Morton termination, that they would hold the Government liable to the end of the contract term for material breaches occurring prior to that termination. It would be inequitable to allow the plaintiffs to say now that the contracts were no longer in force in February-April 1973.[28] More than that, the bizarre result of accepting the plaintiffs' theory is they would have that right even if Secretary Morton had decided in February 1973 not to terminate but to continue the contracts fully (and the injunction had been dissolved for that reason); it is inconceivable that, at that time, the companies could disinter the pre-1973 occurrences as a basis for claiming a material breach if economics seemed to them to dictate that a lawsuit for damages would be more advantageous than continuance of the contracts.

4. The same facts also bar the plaintiffs under the Uniform Commercial Code's admonition: "Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case." Section 2–703, Comment 1. That the U.C.C. generally makes remedies cumulative and advocates flexibility in order to make the injured party whole does not mean that it sanctions the injured party's pursuit of one course (continuation of the contract) for years, and then a complete turnabout (cancellation) when the initial course proves only partially beneficial.[29] On the contrary, the paradigmatic case for invoking an election of remedy would seem to be the present situation in which the aggrieved contractors successfully sought to impose legal force on their opposite number to continue full performance. That the U.C.C. does not entirely rule out election is shown by a provision which affirmatively favors the application of election in certain circumstances, as well as the continuation of a contract in the absence of clear and prompt cancellation.[30]

---

**25.** Cf. 5A A. Corbin, *supra*, § 1222, at 474–76 (performance, even though under compulsion of a court order, prevents breach from being total). *See also* note 24, *supra*, and accompanying text.

**26.** The Government's liability probably would have been less than the full contract price even if the plaintiffs had treated the Russell termination as a material breach and had won judgment in this court on that basis. *See Northern Helex Co. v. United States, supra*, 524 F.2d 707, 207 Ct.Cl. 862 (1975). The Government's liability certainly would have been less if this court had determined that Under Secretary Russell's action was contractually valid.

**27.** "The acceptance of a settlement or of any substantial advantage, under and by virtue of a claim of one alternative remedy, will bar a subsequent claim to a different remedy." 5A A. Corbin, *supra*, § 1220, at 469 n. 40.

**28.** It would be especially inequitable to allow the plaintiffs to claim, as they do, that the Government's contract right to terminate had ended while the plaintiffs' contract right to payment of the full contract price continued.

**29.** The U.C.C. does require prompt and specific action to preserve rights and remedies in various situations and suggests that affirmative action is necessary when a seller wishes to cancel for the buyer's breach. *See, e. g.*, Uniform Commercial Code §§ 2–602(1), –606(1)(b), –607(3), –608(2), –616, –703; 2 R. Anderson, Uniform Commercial Code § 2–703:35 (1971) (when seller elects to cancel, it is clear that he should manifest intention to do so; Code does not establish method of cancellation, so pre-Code law governs).

**30.** *See* Uniform Commercial Code § 2–612(3); id., Comments 6, 7. Section 2–612(3) states that when a default as to one installment of an installment contract substantially impairs the

### D.

█ The plaintiffs protest that reference to the District Court litigation improperly penalizes them for acting in the public interest to compel the Government's compliance with NEPA. They suggest that this court treat their injunction suit as if it had actually been brought by unrelated parties. Even if we accepted the fiction that the plaintiffs in the injunction suit were there acting solely in the public interest,[31] we would not deny the Government's motions for summary judgment. The facts would remain that these contractors continued performance, accepted the benefits of continued performance by the Government under a decree which expressly continued the contracts in full force and effect, and did nothing to claim (or end the contracts for) material breach before the Government issued the Morton termination. We cannot blink away the fact that, whatever the hats they wore, plaintiffs deliberately sought and enjoyed the advantages of a legally-enforced continuation of the contracts for over a year. If we allowed them now to

rely, in spite of their long delay and acceptance of benefits under the continued contracts, on material breaches alleged to have occurred before the Morton termination, we would be authorizing them to enlarge their rights for material breaches, not merely preserving the rights they would have if they had not brought the injunction suit.

### E.

█ The companies also urge, in excuse, that their continued performance was compelled by the injunction and by a provision in each contract requiring performance during the pendency of a dispute under the contract.[32] These arguments are not acceptable [33] but even if they were they would not be helpful. It would still be plaintiffs who forced the Government to continue performance against its will, and who received the advantages of that compulsion. In that situation they had, at the least, the duty to take appropriate action to claim material breach, and keep alive that claim, regardless of any requirement that they themselves continue performance while the

value of the whole, the default is a breach of the whole and justifies cancellation (*see also* §§ 2–703, –711). However, the aggrieved party reinstates the contract if he accepts the installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments. Official Comments 6 and 7 make clear that the rule established is intended to continue contracts in the absence of overt cancellation and applies both to seller and buyer. Comment 7 stresses notification within a reasonable time, evaluated under the good faith standard.

**31.** The argument that the plaintiffs acted solely in the public interest overlooks two facets of the District Court litigation. The plaintiffs petitioned for more than review under NEPA and an injunction to compel compliance with NEPA; they attempted to obtain a ruling that the Russell termination was contractually invalid and succeeded in obtaining a declaratory judgment pronouncing the contracts in full force and effect. *See* notes 5, 21, *supra*. These latter actions had to be undertaken in their private capacities. Further, both the district and circuit courts noted that plaintiffs' private interests played a significant role. *National Helium Corp. v. Morton*, 361 F.Supp. 78, 90 (D.Kan.), *rev'd on other grounds*, 486 F.2d 995

(10th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *National Helium Corp. v. Morton*, 455 F.2d 650, 654, 655 (10th Cir.), *aff'g* 326 F.Supp. 151, 157 (D.Kan. 1971).

**32.** National Helium mentions one further contract term as an indication that the parties intended that continued performance be without prejudice to either party's rights; the clause provided that waiver of one default could not operate or be construed as waiver of a further default. This clause had no application to this case because we are not construing a waiver of one breach as a waiver of another, later breach.

**33.** The injunction operated only against the Government and therefore required nothing of the plaintiffs. As for the contract provision requiring continued performance, it applied only during the pendency of a dispute *under* the contract and therefore did not cover a claim for a material breach of a kind which would empower the contractors to end the contracts entirely. *See United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 412, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *Universal Ecsco Corp. v. United States*, 385 F.2d 421, 424, 181 Ct.Cl. 10, 15 (1967).

claim awaited resolution. An explicit reservation could and should have been made of the right to consider the contract at an end. Better still, if the plaintiffs thought that their continued performance was obligatory, they could have followed Northern Helex's example and filed suit here with the explicit notification that they would continue performance for specified reasons. No special factors justify the delay of suit in this court until well after the conclusion of the District Court proceeding.[34]

We hold, therefore, that because plaintiffs failed to end the contracts before the Morton termination and instead continued their own performance, and also because they affirmatively sought and accepted the benefits of the Government's continued performance, the contracts were still in effect at the time of the Morton termination. On the return of the cases to the trial division, the trial judges will have to determine the validity and effectiveness of the Morton termination under the contract clauses delimiting the grounds for such action. No evaluation of whether any acts prior to that termination constituted independent mate-

rial breaches need be made. In particular, there need be no determination of the validity of the Russell termination, separately from any connection it may have with the Morton termination. We note, however, that evidence pertaining to the Russell termination may possibly be relevant to the validity of the Morton termination; such relevance (and the consequent issues of admissibility) are initially for the trial judges to decide. We intimate no position whatever on the point.

## II

### Plaintiffs' Motions and the Government's Cross-Motions for Partial Summary Judgment

Both plaintiffs have moved for summary judgment on the Government's liability, at the full contract rate plus interest as provided by the contract, for the helium delivered and tendered July 1, 1972, through November 19, 1973. They contend that the Government's liability for payments under the contracts continued, because the contracts were continued by the injunction,

---

**34.** Plaintiffs' failure to proceed promptly with both suits cannot be explained as the product of a dilemma as to which claims had to be submitted to each tribunal or of an assumption that all claims could eventually be joined in one proceeding. We have emphasized that their course of action, especially their complete reversals of position late in the game, prejudiced the Government and benefitted themselves. Only one principle might have excused part of their delay in filing suit here: As a general rule, a good faith attempt to obtain a remedy for breach of contract which is in fact unavailable to the plaintiff does not bar a suit for another remedy for breach. E. g., Restatement of Contracts § 383 (1932). Therefore, to the extent that some portion of the District Court suit could have been considered a good faith attempt to obtain one of the remedies for breach of contract, plaintiffs might have been able to bring suit here after having been denied contract relief there. However, the Court of Appeals made clear in its first decision that the plaintiffs could not have their contract rights adjudicated in the injunction suit (*see* note 7 *supra*), and plaintiffs could have immediately filed suit here to preserve the material breach rights they now claim.

Cities Service attempts to legitimize the long delay in suit in this court on another ground; it

contends that the Russell termination was a repudiation that the Government never withdrew and that suit for material breach is allowed at any time before a repudiating party withdraws its repudiation. See note 24, supra. There are several answers. First, we doubt that a good faith attempt to exercise a termination right under the contract should be labeled a repudiation of the contract. Second, even if such action could be considered repudiation or if the termination was in bad faith (and therefore a repudiation), defendant's continued performance should be deemed withdrawal of repudiation. See notes 24, 25 supra. The lenient rule allowing the aggrieved party to delay suit assumes that the repudiator has discontinued performance and incurs no further costs or detriment because of the other's inaction. Third, in the case of repudiation the Uniform Commercial Code limits the aggrieved party's right to wait to a commercially reasonable time. Uniform Commercial Code § 2–610(a). Fourth, the right to act on the repudiation may be lost, just as the right to end a contract for other types of material breach may be lost, if as here both parties continue performance. Thus, the same circumstances that preclude plaintiffs from claiming material breach prior to the Morton termination also preclude them from arguing repudiation via the Russell termination.

until the injunction was dissolved on November 19, 1973. The Government admits liability to April 4, 1973, the date the Morton termination was to have become effective, but denies liability after that time. The denial is premised on the Tenth Circuit's final decision holding the Government's environmental impact statement adequate and requiring dissolution of the injunction. The Government argues that the effect of the Court of Appeals' reversal in 1973 of the District Court was to end the injunction, and the plaintiffs' right to payment under the injunction, as of April 4.[35] For the period after that date, the Government opposes plaintiffs' motions and cross-moves on this thesis.[36]

There is no bar to entry of judgment for plaintiffs on the Government's liability for the contract price to April 4, 1973. Since the defendant concedes its responsibility, the parties and court need not invest time and money in further litigation on the issue. *Cf.* 6 J. Moore, Federal Practice § 56.11 (2d ed. 1976); 4 J. Wigmore, Evidence § 1064 (J. Chadbourn rev.ed. 1972); 9 J. Wigmore, Evidence §§ 2588–90 (3d ed. 1940); 61 Am. Jur.2d Pleading § 179 (1972); 29 Am.Jur.2d Evidence §§ 615, 687 (1967).

However, the Government's post-April 4 liability is not so easily disposed of. As is apparent from the brief summary of the parties' arguments, determination at this time of that liability could entail the interpretation of another court's injunction, and its reversal by the appellate court, and an evaluation of the effect of the injunction and its reversal—in a suit which did not determine contract rights—on those rights which are for this court's adjudication. We decline now to resolve these difficult and sensitive questions because they will be mooted if it is concluded that the Morton termination was invalid.[37] For that reason we cannot at this time determine the issues definitively, and we may never have to answer them at all.[38]

## CONCLUSION

The Government's motions for partial summary judgment are granted. The plaintiffs' motions are also granted to the extent of the Government's liability, at the contract rate plus contract interest, for unpaid helium delivered to April 4, 1973, but the plaintiffs' motions and the Government's cross-motions are otherwise denied without prejudice. The amount of plaintiffs' recovery for helium delivered to April 4, 1973, the effective date of the Morton termination, will be determined under Rule 131(c). The cases are remanded to the Trial Division for further proceedings in accordance with this opinion.

---

35. As we understand it, the Government's reasoning is as follows: Under the Circuit Court's decision, the Government had brought itself into compliance with NEPA by April 4, 1973, so the continuation of the injunction after that date was improper. The plaintiffs' right to payment under the injunction falls with the injunction. Moreover, in the Government's view there was no contractual right to payment after April 4 because the Morton termination was valid and effective as of that date.

36. The basis of the Government's cross-motions, to recover any amount that it is required to pay plaintiffs for helium delivered and tendered after April 4 because of the injunction, is that the plaintiffs should not be allowed to benefit from the erroneous continuation of the injunction after April 4.

37. If the Morton termination was invalid or ineffective, the contracts continued beyond April 4, regardless of the effect of the injunction and its reversal.

38. This ruling implies, of course, no view of the validity or effectiveness of the Morton termination.