956 F.2d 1566
 DUNKIN' DONUTS OF AMERICA, INC., a foreign corporation,
Plaintiff-Appellant, Cross-Appellee,
v.
MINERVA, INC., a Florida Corp., Rosebud, Inc., a Florida
Corp., Katherine Apostoleres, an individual,
Defendants-Appellees, Cross-Appellants.
DUNKIN' DONUTS OF AMERICA, INC., a foreign corporation,
Plaintiff-Appellee,
v.
MINERVA, INC., a Florida Corporation, Rosebud, Inc., a
Florida Corporation, Katherine Apostoleres, an
individual, Defendants-Appellants.
DUNKIN' DONUTS OF AMERICA, INC., a foreign corporation,
Plaintiff-Appellant,
v.
MINERVA, INC., a Florida Corporation, Rosebud, Inc., a
Florida Corporation, Katherine Apostoleres, an
individual, Defendants-Appellees.
 Nos. 90-3124, 90-3244 and 90-3373.
 United States Court of Appeals,
Eleventh Circuit.
 April 8, 1992.
 
 Edward O. Savitz, Patricia Labarta, Tampa, Fla., for Dunkin' Donuts of America, Inc.
 Martin L. Garcia, Dennis P. Waggoner, Tampa, Fla., for Minerva, Inc., et al.
 Appeals from the United States District Court for the Middle District of Florida.
 Before HATCHETT and DUBINA, Circuit Judges, and CLARK, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this breach of contract case, we affirm the magistrate judge's grant of judgment n.o.v. reducing damages awarded to the franchisees, denial of judgment n.o.v. as to the franchisor's liability, and denial of the franchisees' motion for attorney's fees.[1]
 
 FACTS
 
 2
 In 1976, Katherine Apostoleres became the sole shareholder of Minerva, Inc., which owned the rights to a Dunkin' Donuts of America, Inc. (Dunkin') franchise in Brandon, Florida. In 1978, Apostoleres became the sole shareholder of Rosebud, Inc., which owned the rights to a Dunkin' franchise in Temple Terrace, Florida. Apostoleres and her family (the franchisees) operated both stores.
 
 
 3
 In early 1982, Dunkin' offered to all its franchisees the right to renew the term of the franchisee's existing franchise agreement for an additional ten years at a fixed cost of $5,000. In return, the franchise owner would be required to participate in a program to abide by advertising decisions favored by at least two-thirds of the local franchise owners in a given television market. Apostoleres refused to accept the offer because she did not want to be bound by the "two-thirds" clause.
 
 
 4
 In August, 1982, Dunkin' employees audited Apostoleres's Temple Terrace and Brandon stores including use of the "yield and usage" method which projects a store's gross sales by taking the weights of a small number of donuts and extrapolating how many donuts should have been produced based upon those weights. The franchisees' agreements with Dunkin' did not provide authority to conduct an audit based upon such methodology.
 
 
 5
 In late 1982, the audits revealed that reported sales generally agreed with the sales run through the cash registers, bank deposits, and tax returns for the audited period; however, the yield and usage analysis detected an apparent underreporting of gross sales at both stores. The franchisees denied any underreporting and asserted that the yield and usage analysis provided inherently unreliable results.
 
 
 6
 In September, 1985, Dunkin' again audited the franchisees' stores. The audit of the Temple Terrace store disclosed no underreporting. The audit of the Brandon store reflected an underreporting of gross sales based upon the yield and usage analysis. The audit also detected a substantial difference between the total of sales rung into the registers at the Brandon store and the total of sales actually reported to Dunkin'. In a June 17, 1986 letter, Dunkin' gave the franchisees notice of immediate termination of the franchises.
 
 
 7
 Despite the notice of termination and the ensuing litigation, the franchisees have continued to operate profitably the two stores as Dunkin' franchises.
 
 PROCEDURAL HISTORY
 
 8
 In June, 1986, Dunkin' filed a two-count complaint alleging that the franchisees breached provisions of the franchise agreements. Both counts sought damages and injunctive relief as a result of the franchisees' alleged acts of failing to record and report all sales and failing to pay Dunkin' the appropriate percentages on those unreported sales.
 
 
 9
 In July, 1986, the franchisees filed a five-count counterclaim against Dunkin'. Count I alleged that Dunkin' had breached the obligation of good faith implied in the franchise agreements; Count II alleged that Dunkin' had breached a fiduciary duty; Count III alleged a violation of the Florida Deceptive and Unfair Trade Practices Act; Count IV alleged a violation of a Massachusetts unfair business practices statute; and Count V alleged that a Dunkin' employee had slandered Apostoleres. The franchisees sought monetary relief and injunctive relief prohibiting Dunkin' from attempting to terminate either of the franchise agreements by reason of the alleged underreporting of sales.
 
 
 10
 In response to a motion Dunkin' filed, the district court dismissed Counts II and IV of the counterclaim. On January 25, 1989, the parties jointly requested that the district court refer the case to a United States magistrate judge for all further proceedings, including trial, and the district court granted the motion. The trial commenced in September, 1989, and the jury returned a verdict against Dunkin' on its breach of contract claim, against the franchisees on the slander claim, and in favor of the franchisees on their breach of contract claim, awarding the franchisees $650,000. The franchisees filed a notice of tender of their franchise rights.
 
 
 11
 On December 8, 1989, the magistrate judge granted Dunkin's motion for judgment notwithstanding the verdict as to damages and reduced the $650,000 award to a nominal award of $2. The magistrate judge also granted conditionally Dunkin's motion for partial new trial as to the franchisees' counterclaims to the extent that the judgment n.o.v. should be reversed on appeal, but denied Dunkin's motion for judgment n.o.v. on the issue of Dunkin's liability. On January 5, 1990, the magistrate judge denied the franchisees' application for attorney's fees and awarded costs of $7,122.31 to the franchisees. On February 27, 1990, the magistrate judge denied the franchisees' petition for injunctive relief asking the magistrate judge to enjoin Dunkin' from committing continued breaches of the franchise agreements. Both Dunkin' and Apostoleres now appeal.[2]
 
 CONTENTIONS
 
 12
 Apostoleres contends that the magistrate judge erred in entering judgment n.o.v. with respect to damages and erred in conditionally granting a new trial with respect to her counterclaim. Apostoleres also contends that the magistrate judge erred in denying her motion to recover attorney's fees. Finally, Apostoleres contends that the magistrate judge properly denied Dunkin's motion for judgment n.o.v. or new trial on the issue of Dunkin's liability.
 
 
 13
 Dunkin' contends that the magistrate judge erred in denying Dunkin's motion for judgment n.o.v. or new trial as to Dunkin's liability. Dunkin' also contends that the magistrate judge properly granted Dunkin's motion for judgment n.o.v. concerning damages, properly conditionally granted Dunkin's motion for partial new trial, and properly denied Apostoleres's motion for reasonable attorney's fees.
 
 ISSUES
 
 14
 The issues are: (1) whether the magistrate judge erred in denying Dunkin's motion for judgment n.o.v. or new trial on the issue of Dunkin's liability; (2) whether the magistrate judge erred in entering judgment n.o.v. with respect to damages; and (3) whether the magistrate judge erred in denying Apostoleres's motion for attorney's fees.
 
 DISCUSSION
 
 15
 The standard of review for the grant or denial of a motion for judgment n.o.v. is the same as that applied by the district court. Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir.1989). We consider all the evidence and reasonable inferences in the light most favorable to the party opposed to the motion. If the facts and inferences point overwhelmingly in favor of the moving party, such that a reasonable jury could not arrive at a contrary verdict, then the motion should be granted. Carter, 870 F.2d at 581. On the other hand, if substantial evidence opposed to the motion exists, such that reasonable people might reach different conclusions, then the motion should be denied. Miles v. Tennessee River Pulp and Paper Co., 862 F.2d 1525, 1528 (11th Cir.1989).
 
 I. Dunkin's Liability
 
 16
 Under Massachusetts law, an implied obligation of good faith exists by operation of law in every contract.[3] See Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 408 N.E.2d 1370, 1378 n. 15 (1980).
 
 
 17
 Dunkin' argues that no credible evidence shows that Dunkin' breached its implied obligation of good faith. According to Dunkin', it had scheduled the 1982 audits in the summer of 1981, before Apostoleres rejected the 1982 franchise renewal program. Dunkin' also asserts that the 1985 audit of the Brandon store showed a continuing unfavorable variance, and an unusually large discrepancy between the sales rung through the registers and the sales reported to Dunkin'.
 
 
 18
 Nevertheless, Dunkin' cannot ignore testimony by Apostoleres, her employees, accounting experts, and a former Dunkin' employee which belies Dunkin's contention that it acted in good faith. In denying Dunkin's motion for judgment n.o.v. on the issue of Dunkin's liability for breach of the implied obligation, the magistrate judge concluded that sufficient evidence exists for a reasonable jury to find that:
 
 
 19
 (1) the 1982 audits conducted of defendants' stores were substantially motivated by Mrs. Apostoleres' refusal to subscribe to a franchise renewal option agreement offered by plaintiff; (2) the yield and usage test used by plaintiff to audit the stores had not been disclosed in the franchise agreements as a measure which plaintiff would utilize to enforce its contractual rights and was not an appropriate and reasonably accurate accounting tool in the trade to detect underreporting; and (3) the terminations were not based on good cause because there was no intentional underreporting.
 
 
 20
 After careful study of the record, we agree that a reasonable jury could have found that Dunkin' breached its obligation of good faith and fair dealing.
 
 
 21
 Dunkin' next argues that the magistrate judge should have granted Dunkin's motion for a new trial because Dunkin' was denied a fair trial as a result of Apostoleres's lawyer's repeated and wrongful attempts to impassion the jury. According to Dunkin', opposing counsel referred throughout trial to Dunkin's attempt to "take the stores away" or to "steal the stores," notwithstanding instructions from the court to refrain from so doing. Dunkin' asserts that during jury deliberations, the jury sent out written questions which demonstrate that the jury was improperly concerned with the effect its verdict would have on the franchise relationship. Dunkin' further contends that Frederick Raffa, an economist, improperly testified as to the fair market value of the two stores because fair market value was not a proper measure of recovery. Finally, Dunkin' argues that the magistrate judge erred in refusing to give a jury instruction explaining that if the jury concludes that the franchisees had breached either or both of the franchise agreements, the jury would not by that determination alone cause the stores to be forfeited.
 
 
 22
 In reviewing the magistrate judge's denial of Dunkin's motion for new trial, we find no abuse of discretion. See Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 643 (11th Cir.1990) (district court's denial of a motion for new trial reviewed for abuse of discretion). Dunkin' failed to object to the denial of its requested jury instruction, and has therefore waived this issue. Electro Services v. Exide Corp., 847 F.2d 1524, 1528-29 (11th Cir.1988). With respect to alleged inflammatory remarks made by Apostoleres's lawyer during trial and Raffa's testimony concerning the measure of damages, the magistrate judge corrected any possible prejudicial effect by specifically instructing the jury to disregard references to taking the stores away, and instructed the jury that the proper measure of damages in the case was not the franchises' market value. See Lanham v. Whitfield, 805 F.2d 970, 972 (11th Cir.1986).
 
 II. Apostoleres's Damages
 
 23
 Upon a material breach by Dunkin' of the franchise agreements, it is undisputed that Apostoleres was entitled to recover compensatory or expectancy damages--an amount intended to put Apostoleres in the position she would have been had Dunkin' fully performed under the agreements. Sullivan v. O'Connor, 363 Mass. 579, 296 N.E.2d 183, 186 (1973). If appropriate, such damages include lost future profits. Knightsbridge Marketing Services v. Promociones Y Proyectos, S.A., 728 F.2d 572, 575-76 (1st Cir.1984). The parties also agree that assuming Dunkin' materially breached the franchise agreements, Apostoleres could suspend her performance under the franchise agreements and sue for total breach. Center Garment Co. v. United Refrigerator, 369 Mass. 633, 341 N.E.2d 669, 673 (1976).
 
 
 24
 Apostoleres, however, did not suspend her performance. Nevertheless, Apostoleres argues that she preserved her claim for damages by filing the counterclaims. Specifically, Apostoleres contends that upon the jury's finding of material breach by Dunkin', she is entitled to sever her relationship with Dunkin' and recover damages which include lost future profits over the remaining term of the franchise agreements, though she acknowledges that she must first tender her interest in the franchises to Dunkin'. In response, Dunkin' argues that Apostoleres presented no evidence that Dunkin's breach damaged the franchisees, and that because Apostoleres continued to perform under the franchise agreements and refused to pay Dunkin' compensation for the alleged underreporting, Apostoleres failed to preserve her right to rescind the agreement. According to Dunkin', because Apostoleres never explicitly reserved her right to cease performance, Dunkin' conducted its actions and litigated its case on the basis that Apostoleres intended to remain in the stores with claims only to enjoin Dunkin' from terminating the franchise agreements and to recover damages for breach of contract.
 
 
 25
 In Cities Service Helex, Inc. v. United States, 543 F.2d 1306, 1313, 211 Ct.Cl. 222 (1976), the court examined the effect of continued performance after a material breach of contract:
 
 
 26
 A material breach does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach. [Footnote and citations omitted.]
 
 
 27
 See Kass v. Todd, 362 Mass. 169, 284 N.E.2d 590, 593-94 (1972) (builder who continued to perform and submitted bills after owner's breach could not recover on quantum meruit ).
 
 
 28
 A fair reading of Apostoleres's counterclaim reveals no indication that Apostoleres brought her lawsuit on the theory that Dunkin' committed breach, and in response to such breach, she wished to stop performance and recover lost future profits. In fact, Apostoleres sought injunctive relief to prevent Dunkin' from "unlawfully terminating or attempting to terminate Counterclaimant's franchises." Concerning damages, Apostoleres's counterclaim states that her businesses "have been damaged and have or will suffer the complete destruction of their business and business reputation, including the loss of goodwill," and she therefore seeks compensatory damages. Apostoleres never pleaded relief seeking to terminate or rescind the franchise agreements. In response to a standard arbitration interrogatory asking "in detail the elements of damage for which the plaintiff contends they are entitled to recover," Apostoleres responded, "[c]ompensatory damages for lost business."
 
 
 29
 At the pretrial conference held eleven days before trial, it was unclear whether Apostoleres had based her theory of recovery on damages suffered to the stores' ongoing operations, or rather on damages that would occur should she choose to stop operating the donut stores.[4] Dunkin's lawyer noted that testimony concerning the future value of the franchises should not be considered relevant because Apostoleres had not requested relief which would require Dunkin' to buy back the franchises. Dunkin's counsel recognized that Apostoleres "contended that we breached the franchise agreement by violating an implied obligation of good faith, but [she has not] identified any cognizable damages, and that's the problem." The magistrate judge deferred further consideration of the damages issue until a second pretrial conference six days later. At that time, the magistrate judge determined that the measure of damages would be lost profits and lost future profits assuming Apostoleres could prove they were caused by Dunkin's conduct.
 
 
 30
 Apostoleres argues that Dunkin' assented to Apostoleres's continued performance because it chose to maintain the franchise relationship and not pursue its request for injunctive relief terminating the agreements; thus, her failure to sever the relationship with Dunkin' should not bar her from recovering relief as if the agreement had prematurely ended. Dunkin', however, simply chose to not pursue preliminary injunctive relief. Moreover, though Dunkin' was aware that Apostoleres considered Dunkin's actions a breach of the agreements, nothing indicates that Dunkin' was aware, or should have been aware, that Apostoleres intended to end the agreements. In fact, Dunkin' argues that had it known of such an intention, Dunkin' might have withdrawn its termination notices and not filed a lawsuit at all.
 
 
 31
 Cities Service notes that in Northern Helex Co. v. United States, 455 F.2d 546, 197 Ct.Cl. 118 (1972), the court held that an injured party may continue performance in certain circumstances and yet reserve its right to claim a material breach without the breaching party's assent. 543 F.2d at 1314. In that case, however, Northern Helex notified the government that it considered the government's failure to make payments a material breach which Northern Helex did not waive by the acceptance of payments or the continuation of performance. 455 F.2d at 552. Apostoleres made no such reservation.
 
 
 32
 The Northern Helex court also recognized "a special set of qualifying facts." 455 F.2d at 551. Northern Helex, a seller of helium to the government, had its helium extraction plant bound to other petrochemical operations such that the helium operation had to be continued whether Northern Helex wasted the helium or sold it to the government, the only buyer interested in the product. In this case, contrary to her contention, Apostoleres need not have operated the donut stores to maintain financial stability. At any time, she was free to sell her interest in the franchises.
 
 
 33
 We conclude that Apostoleres is entitled to recover only for those lost profits or lost future profits related to her ongoing operation caused by Dunkin's breach. Because, in Apostoleres's counsel's own words, "this record is deplete of any evidence demonstrating that my clients were damaged in the interim from the time that they were audited or sought to be terminated and until today," the magistrate judge properly granted judgment n.o.v. as to damages.[5]
 
 III. Attorney's Fees
 
 34
 Paragraph 14 of the franchise agreements provides:
 
 
 35
 In the event of any default on the part of the FRANCHISEE, ... the FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default; and all damages, costs and expenses including reasonable attorneys' fees, may be included in and form a part of the judgment entered in any proceedings brought by DUNKIN' DONUTS against the FRANCHISEE.
 
 
 36
 Apostoleres argues that paragraph 14 is ambiguous because it is unclear whether the restriction of an award of attorney's fees to Dunkin' in the language before the semicolon also applies to the language after the semicolon. According to Apostoleres, ambiguous contract language should be construed against the party making the contract, and because Dunkin' created the franchise agreement, paragraph 14 should be interpreted to allow an award of attorney's fees to the franchisees. Alternatively, Apostoleres asserts that paragraph 14 unambiguously permits an award of attorney's fees to either the franchisor or the franchisee.
 
 
 37
 Whether contract language is ambiguous is a question of law subject to plenary review. In re Sublett, 895 F.2d 1381, 1383-84 (11th Cir.1990). The magistrate judge ruled that paragraph 14 is unambiguous and provides that only Dunkin' may recover the attorney's fees it has incurred. The magistrate judge reasoned that the language after the semicolon simply qualifies and expands on the preceding clause in accord with general rules of grammatical construction. After examining the entire agreement between Apostoleres and Dunkin', we agree that paragraph 14 permits only Dunkin' to recover attorney's fees.
 
 CONCLUSION
 
 38
 For the above reasons, we affirm the magistrate judge's rulings in all respects.
 
 
 39
 AFFIRMED.
 
 
 40
 CLARK, Senior Circuit Judge, concurring in part and dissenting in part:
 
 
 41
 Although concurring in those parts of the opinion with respect to affirming the rulings against Dunkin' Donuts, I dissent with respect to the principal holding in this case because the majority misreads the record at a critical point and for that or some other reason fails to apply long-established legal principles governing a party's right to elect a particular remedy when two or more are available to him.
 
 
 42
 This is a simple case. Dunkin' wanted to escape from its franchise contracts with Apostoleres, sent her notices of termination of their agreements, and then sought termination in the district court when she refused to accede. Apostoleres replied by denying that Dunkin' had cause to terminate the contracts and by counterclaim sought damages for Dunkin's breach. The jury saw the error of Dunkin's ways and awarded $650,000 in damages to Apostoleres for loss of profits during the balance of the contracts. Apostoleres thereafter filed her notice of tender of franchise rights, acknowledging her obligation to tender her rights in the franchise agreements in return for the $650,000 awarded by the jury for lost future profits.
 
 
 43
 The resolution of this case has become needlessly confused by appellee Dunkin' and the majority of this panel over the issue of Apostoleres' continued operation of the franchises following Dunkin's notices of termination. If Apostoleres had ceased operation of the franchises at that time, she certainly would be entitled to damages for Dunkin's total breach of contract. The majority holds that Apostoleres' continuance prevents her from collecting any but nominal damages, because the continuance worked an "election of remedies" of damages for partial breach of contract. Yet by continuing performance, Apostoleres reduced the damages due from Dunkin' for total breach of contract. It is inconceivable that such conduct, otherwise encouraged by the legal system, should prevent Apostoleres from recovering the full amount of the jury award.
 
 
 44
 On the issue of damages, Apostoleres' appeal raises three issues: (1) Did Apostoleres give Dunkin' adequate notice of her intent to terminate the franchise relationship and seek damages for total breach of contract? (2) Should Apostoleres' continued performance of the contract estop her from seeking damages for total breach of contract? (3) Given that Apostoleres properly preserved her claim for total breach of contract, what was the proper measure of her damages?
 
 I.
 
 45
 Although its exact basis for decision is unclear, the majority seems to hold that Apostoleres had to reserve her right to seek damages for total breach while continuing performance.[1] The record demonstrates that Apostoleres in fact made a sufficient reservation of rights in her counterclaim and during the course of the proceedings.
 
 A. The Counterclaim
 
 46
 In June of 1986, Dunkin' sent a letter notifying Apostoleres of its immediate termination of their franchise agreements, due to Apostoleres' alleged breach of the agreements. Ten days later, Dunkin' filed a complaint alleging breach of contract by Apostoleres. The complaint demanded "entry of judgment against Defendants MINERVA, INC. and KATHERINE APOSTOLERES enjoining them from continuing to use and operate a Dunkin' Donuts Shop and awarding to Plaintiff damages, plus interest, court costs and reasonable attorney's fees and such other and further relief as may be appropriate under the circumstances."[2] Apostoleres filed a counterclaim and asserted that she had suffered or would suffer "the complete destruction of [her] business"[3] and requested "compensatory and punitive damages ... and such other and further relief as may be appropriate under the circumstances."[4]
 
 
 47
 Apostoleres' pleadings clearly request damages for Dunkin's termination and repudiation of the contracts and meet the notice pleading requirements of Federal Rule of Civil Procedure 8. Since a franchise contract is a personal services contract and may not be specifically enforced,[5] Apostoleres could not as a matter of law have sought to have the franchise contracts extended since Dunkin' (as indicated by its notices of termination and complaint) was no longer willing to deal with her. In context, Apostoleres' pleadings were sufficient to put Dunkin' on notice that the contracts would be terminated as the result of the litigation. Indeed, it is impossible to understand the majority holding that Dunkin' should now prevail in its argument that it had no notice the contracts could be terminated, when it had terminated the contracts by its notices and its lawsuit. Dunkin' merely elected not to seek by interlocutory relief immediate termination prior to trial.
 
 
 48
 The majority's cramped interpretation of Apostoleres' pleadings is in direct disobedience to the instructions for the construction of pleadings contained in the Federal Rules of Civil Procedure. Rule 8(f) states, "All pleadings shall be so construed as to do substantial justice." Because Apostoleres has lost and will lose a substantial sum of money as the result of Dunkin's wrongful termination and consequent lawsuit,[6] "substantial justice" requires that her pleadings be read as asking for termination and damages for total breach of contract.
 
 
 49
 Furthermore, rule 54(c) unequivocally states, "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Our cases have interpreted this rule liberally, "leaving no question that it is the court's duty to grant whatever relief is appropriate in the case on the basis of the facts proved."[7] The only relevant limitation to this rule arises when a failure to ask for a particular relief substantially prejudices the opposing party.[8] In this case, Dunkin's defenses against Apostoleres' breach of contract claim were as relevant to a claim for damages for total breach of contract as to a claim for damages for partial breach of contract. And Dunkin' specifically requested the termination of the franchise agreements, the exact relief granted by the jury and which Apostoleres' now seeks to sustain. Dunkin' was not prejudiced, substantially or otherwise, by Apostoleres' claim.[9] Under a proper interpretation of the pleadings, Apostoleres did give Dunkin' notice of her intention to give up the franchises and did reserve her right to seek damages for total breach of contract.
 
 B. The Proceedings
 
 50
 The majority erroneously leaves the impression that Apostoleres never gave Dunkin' explicit notice of her intention to accept Dunkin's repudiation of the franchise agreements and to seek damages for total breach of contract in any of her pretrial filings or otherwise during the course of the litigation.[10] The majority is correct that Apostoleres at one time asserted that she sought compensatory damages and did not mention damages for total breach.[11] However, this assertion was made during an unsuccessful attempt at arbitration, when it was reasonable for the parties to narrow their differences. Apostoleres clearly and consistently requested termination and damages for total breach thereafter when arbitration failed. During discovery, Apostoleres' attorney wrote Dunkin's attorney and stated,
 
 
 51
 Our primary position in the counterclaim will be that a failure of Dunkin' Donuts being able to show that their termination of the franchise was proper will necessarily result in Dunkin' Donuts having breached the franchise agreement. In that scenario and in cases where a franchisee has been wrongfully terminated, courts are unwilling to force a continued relationship between the parties. Accordingly, the relief is in damages. In a straight breach action resulting in wrongful termination, where the Court is unwilling to force a continued franchise relationship between the parties, the appropriate measure of damages would be the loss of business income for the remainder of the franchise term as well as the time, effort and money invested in the business. Essentially, it is unfair for a franchisor to allow a franchisee to create a viable business and subsequently terminate that business without good cause and to prohibit the franchisee from retaining the monies expended in developing the investment.[12]
 
 
 52
 Apostoleres also notified Dunkin' of her intent to terminate the contracts and seek damages for total breach by way of her legal motions.[13] In the pretrial stipulation, Apostoleres stated as an issue: "Should Defendants prevail in the defending against Plaintiff's claim or should they prevail on the Counterclaims whether this Court should appropriately order a continued franchise[e]/franchisor relationship between the parties[?]"[14] In her trial brief, Apostoleres stated, "Defendants seek damages in the amounts of [the] value of the businesses that were wrongfully terminated."[15] Apostoleres clearly put Dunkin' on notice prior to trial as to the type of damages she was seeking. Following trial, Apostoleres formally tendered her franchise rights to Dunkin'.[16]
 
 
 53
 The majority asserts that Apostoleres did not clarify at the pre-trial conferences whether she sought damages for partial or total breach of contract.[17] But Apostoleres' attorney argued,
 
 
 54
 The premise of this law and the foundation is that there's one or two reliefs that would be available to my client. If [Dunkin'] lose[s], then there's one or two things that happens. We either get an injunction that says we stay married, or we get the damages for their wrongful attempt to divorce us. And the courts have said the first one is specific performance, we don't like it, we don't make people stay married. The second one is what you're entitled to. And our position is, if they have wrongfully terminated us, then we get the value of the business.[18]
 
 
 55
 Apostoleres did specify the theory under which she was seeking damages; Apostoleres clearly sought termination and damages for the total breach. Obviously, Apostoleres could not receive specific performance and damages for a partial breach and also receive damages for a total breach.[19]
 
 
 56
 The pretrial stipulation, which by Rule 16 amends the pleadings and governs the trial of the case, states as part of "Defendants' Statement of Its Case": "In light of the unique relationship between a franchisee and a franchisor, the appropriate remedy for Plaintiff's breach and acts would be to award Defendants the benefit of their franchise agreements for the remainder of the franchise terms and other damages allowable by law." It is clear that Apostoleres was doing exactly what she had the right to do: (1) defend against Dunkin's assertion that she had breached the contracts and (2) seek as damages for Dunkin's breach of the contracts the value of the franchise for the balance of its term. It is a clear as a bell that Apostoleres was seeking from the court damages for Dunkin's breach of the contract between the parties.
 
 
 57
 In sum, the counterclaim, other filings, and statements made during the course of the litigation clearly manifested Apostoleres' acceptance of Dunkin's repudiation of the agreements and her intent to terminate the contracts. Apostoleres thus reserved her right to seek damages for total breach of contract.
 
 II.
 
 58
 The majority is wrong on more than its interpretation of the record. The majority seems to hold that Apostoleres made an election of remedies by continuing performance without an explicit reservation of rights. This holding imports an antiquated[20] doctrine into the law of Massachusetts that has been specifically rejected by that state's courts. Massachusetts law is that, if no estoppel is created by the continued performance of a contract, no remedy has been elected, and damages for total breach of contract may be had.
 
 A. The Election of Remedies Doctrine
 
 59
 The majority's approach to the election of remedies doctrine has been rejected by the courts of Massachusetts, as well as most other courts. These courts look only to whether an estoppel was created in determining whether an aggrieved party has elected a remedy. These courts have adopted the position of Professor Corbin, who has written,
 
 
 60
 The view with respect to election of remedies that is now becoming the prevailing one and that ought to be accepted is that, where a party injured by a breach definitely manifests a choice of a remedy that is actually available to him, in the place of some other alternative remedy, such a manifestation will bar an action for the latter remedy, provided that the party against whom the remedy is asked made a substantial change of position in reliance on the manifestation of intention before notice of its retraction. This makes the conclusiveness of an "election" depend upon the existence of facts sufficient to create an "estoppel." Cases stating this view are now very numerous and hold either that the remedy asked was not barred because there was no basis for an estoppel, or that an election was conclusive only because such a basis had been proved. The mere bringing of a suit asking one remedy rather than another practically never affords ground for an estoppel and is not sufficient reason to deny an application for an alternative remedy.[21]
 
 
 61
 In short, if there has been no estoppel created, there has been no conclusive election of remedies.
 
 
 62
 In the relatively recent case of Plunkett v. First Federal Savings & Loan Association,[22] the Appeals Court of Massachusetts held that the plaintiffs' actions in pressing for continued performance of an agreement, and their failure to take action to set aside the agreement, did not create an election of remedies such that the plaintiffs could not later attempt to set aside the agreement. In so holding, the court looked only to the fact that no estoppel was created by the plaintiffs' attempts to seek continued performance of the agreement.[23] The court noted, "The [plaintiffs] are not barred from seeking to enforce ... their claim against [the defendant] by any principle that they have elected to follow an inconsistent remedy without a clear attempt to rescind or set aside the 1972 agreement."[24] The court cited, inter alia, the above-quoted section of Corbin on Contracts in reaching its conclusion and remarked, "These authorities suggest that principles concerning election of remedies have been much modified in recent years."[25] The Plunkett case is precisely on point here, as Plunkett essentially holds that continued performance after a breach of an agreement does not, without an estoppel, prevent a subsequent request for an inconsistent remedy. The majority therefore applies an incorrect analysis as a matter of state law.[26]
 
 
 63
 I add that many other authorities support the approach to election of remedies taken by Massachusetts. The influential Restatement (Second) of Contracts (also cited by Plunkett ) states with regard to election of remedies,
 
 
 64
 If a party has more than one remedy under the rules stated in this Chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation.[27]
 
 
 65
 A large number of state courts have also adopted Professor Corbin's view.[28]
 
 
 66
 The Uniform Commercial Code is applicable by analogy to franchise agreements.[29] The official commentary notes that the U.C.C. "rejects any doctrine of election of remedy as a fundamental policy." Moreover, "Whether the pursuit of one remedy bars another depends entirely on the facts of the individual case."[30] By analyzing election of remedies on a case-by-case basis, the U.C.C. essentially adopts the Corbin view that an estoppel must be created for an election to bar relief.
 
 
 67
 Indeed, the principal case relied upon by the majority found an estoppel prior to finding an election of remedies. The majority quotes language from the decision of the former Court of Claims in Cities Service Helex, Inc. v. United States[31] to support its holding that Apostoleres' continued performance worked an election of remedies.[32] Elsewhere in its opinion, the Court of Claims discussed three formulations of the doctrine. Under the strictest approach, "any act indicating an intent to continue the contract is an election."[33] The intermediate formulation of the doctrine allows a plaintiff to continue performance, provided an explicit reservation of rights is made.[34] The most lenient view of the doctrine finds an election of remedies only when an estoppel is created.[35] The majority seems to have selected the intermediate formulation for application here. However, the Cities Service Helex court reached its conclusion only after finding an election of remedies under all existing formulations of the election doctrine, including the estoppel approach.[36] Even by the measure of its own citations, the majority is out-of-step with the great weight of authority in its failure to determine whether an estoppel was created by the continued performance of the franchise agreements. In doing so, the majority fails to follow binding Massachusetts law.
 
 
 68
 B. Was an Estoppel Created?
 
 
 69
 Massachusetts courts have defined the three elements of estoppel as follows:
 
 
 70
 (1) A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made. (2) An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made. (3) Detriment to such person as a consequence of the act or omission.[37]
 
 
 71
 The first element of estoppel is not satisfied here, as Apostoleres by her conduct did not indicate that she wanted to continue the contracts. The second element likewise is not satisfied. The majority notes Dunkin's argument that had it known of Apostoleres' intent to terminate the contracts, "Dunkin' might have withdrawn its termination notices and not filed a lawsuit at all."[38] Dunkin's contention that it would have retracted the termination notices is not convincing, because Dunkin' never took such action after being clearly informed during the course of the litigation that Apostoleres make clear her right to elect to terminate the contracts and seek damages for total breach. Dunkin's argument that it might not have filed the lawsuit in the first place is a red herring, because Apostoleres would have surely (and rightly) filed a lawsuit for breach of contract if she had stopped performing on the contracts as the result of Dunkin's termination notices.
 
 
 72
 The first two elements of estoppel are not present, and the third element--detriment--is clearly not. Apostoleres' continuation actually served to mitigate the damages due to her as a result of Dunkin's breach: Apostoleres' damages were calculated from the date of the trial, not the date of the breach of the contracts.[39] This is not a case where one side has "continue[d] after a material breach by the other (such as failure to pay), act[ed] as if the contract remain[ed] fully in force (although stopping performance would be fair and convenient), run up damages, and then go[ne] suddenly to court."[40] Apostoleres' continued performance did not "run up damages" but instead lessened them. Indeed, Apostoleres had an affirmative duty to attempt to mitigate damages by continuing performance.[41] I can conceive of no harm to Dunkin' and it did not establish any. Dunkin' therefore suffered no discernible detriment because of Apostoleres' continued performance, and no estoppel was created.
 
 
 73
 Moreover, applications of both the doctrines of equitable estoppel and election of remedies depend on the avoidance of injustice.[42] The injustice, if any, suffered by Dunkin' due to Apostoleres' continued performance is difficult to pinpoint. Both sides were fully aware that something was amiss with the franchise relationship and that the contracts could be terminated as a result of the litigation. Dunkin', through the notices of termination and the lawsuit, clearly sought the exact relief that Apostoleres is entitled to by virtue of the jury's award. That the jury did not find in Dunkin's favor does not change the fact that Dunkin' knew from the very start of this litigation that termination of the contracts was a possible outcome.[43] It takes two to continue performance, and Dunkin' neither sought an immediate injunction against continued performance nor took any other measures to stop the operation of Apostoleres' franchises.
 
 
 74
 The jury's verdict indicates that they believed Dunkin' attempted to terminate the contracts in retaliation for Apostoleres' opposition to Dunkin's advertising plans; if Dunkin's motive in bringing this suit was simply to harass Apostoleres, it has well succeeded. I can see no evidence that Dunkin' suffered an injustice due to Apostoleres' continuation and much evidence that Apostoleres will suffer an injustice from an application of equitable estoppel.
 
 
 75
 Even if an estoppel was created by Apostoleres' actions, the facts of this case show that an estoppel against an estoppel exists. By sending notices of termination and then filing a suit seeking to terminate the franchise contracts, Dunkin' clearly indicated that it sought the relationship's end. Apostoleres may well have relied upon this representation in not specifically asking for termination of the contracts in her counterclaim. And Apostoleres is clearly suffering a detriment from Dunkin's misrepresentation of its intentions as to the continuance of the contracts. "In such a situation there is an estoppel against an estoppel which, in Coke's oft-quoted language, sets the matter at large. The one estoppel neutralizes the other."[44]
 
 
 76
 The majority's approach to election of remedies results in a gross injustice, which is evident by merely reading the facts. I would follow Plunkett and find that no estoppel--and thus no election of remedies--was created by Apostoleres' continued performance.
 
 III.
 
 77
 I must address the further question of whether Apostoleres was entitled to the full amount of the jury's award of damages. The magistrate judge reduced the damages to one dollar for each franchise. The magistrate judge articulated two reasons for this reduction: First, "Massachusetts courts addressing the issue of the proper remedy for breach of implied covenant of good faith and fair dealing in the at-will employment context have rejected any attempt to fashion relief based on compensation for future services."[45] Second, the magistrate found no causal connection between Dunkin's actions and Apostoleres' claimed loss of the entire value of the business.[46] However, the magistrate judge improperly analogized the franchise agreements to the at-will employment context, and she failed to recognize that she could not order the specific performance of the franchise contracts or that Apostoleres' claim sounded in anticipatory repudiation.
 
 A. The At-Will Employment Analogy
 
 78
 The magistrate judge should not have relied upon caselaw concerning at-will employment agreements, because those agreements by definition run indefinitely. The franchise agreements here were for a specific term of years. In cases involving employment agreements for a definite term, the Massachusetts courts allow recovery for wrongful termination to be based upon a calculation of the wages that would have been earned under the agreement.[47]
 
 B. Apostoleres' Loss
 1. Specific Performance
 
 79
 The second rationale given by the magistrate judge for the reduction of damages was essentially that Apostoleres had suffered no tangible loss by virtue of Dunkin's actions and so could not receive damages. But neither party was entitled to specific performance of the franchise agreements.[48] Given that both parties had expressed a desire to terminate their relationship prior to the rendering of the jury's verdict, the magistrate judge was without power to order (in effect) Apostoleres' continued performance of the franchise agreements.[49] The only alternative was for the district court to return the franchises to Dunkin' in exchange for the jury's award.
 
 2. Anticipatory Repudiation
 
 80
 Another basis for affording Apostoleres the benefit of the jury's award is that Dunkin' committed a breach of contract by anticipatory repudiation. Dunkin' wrongfully repudiated the franchise agreements, and Apostoleres accepted that repudiation. Because Apostoleres' continued performance did not work an estoppel, she was entitled to terminate the agreements and receive the lost future profits of the franchises.
 
 
 81
 The Restatement (Second) of Contracts states, "Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach."[50] The Restatement defines a claim for damages for total breach of contract as "one for damages based on all of the injured party's remaining rights to performance."[51] I note that Massachusetts is the only state that refuses to recognize actions for anticipatory repudiation of contracts.[52] There are a number of exceptions to this refusal. One exception is that "when an anticipatory repudiation is accompanied by an actual breach, an action may be brought for breach of the entire contract at once."[53] In our case, Apostoleres claimed (and the jury found) that Dunkin' had committed an actual breach of the contract by wrongfully auditing Apostoleres' records prior to Dunkin's repudiation. Therefore, Apostoleres could maintain suit on an anticipatory repudiation in Massachusetts. A second exception arises from Massachusetts' adoption of the Uniform Commercial Code, which provides for actions for anticipatory repudiation.[54] As to the sale of goods, and by analogy to the franchise contracts involved here, Massachusetts has accepted the doctrine of anticipatory repudiation.[55] Finally, Massachusetts may recognize an exception "where the contract may fairly be interpreted as establishing between the parties a present relation of mutual obligations."[56] Such a relationship was clearly formed through the parties' franchise agreements. In sum, Apostoleres' claim for anticipatory repudiation fits squarely into several exceptions to Massachusetts' anomalous refusal to allow such claims.
 
 
 82
 Dunkin's actions in sending the notices of termination and in filing this lawsuit amounted to "an unqualified refusal, or declaration of inability, substantially to perform according to the terms of [its] obligation."[57] Apostoleres was accordingly entitled to treat their relationship as at an end.[58] But Apostoleres did not have to treat Dunkin's notices of termination and lawsuit as a breach of contract. One court has written,
 
 
 83
 It would seem on principle that the declaration of such intention [not to carry out the contract] is not in itself and unless acted upon by the promisee a breach of the contract.... [S]uch declaration only becomes a wrongful act if the promisee elects to treat it as such. If he does so elect, it becomes a breach of contract, and he can recover upon it as such.[59]
 
 
 84
 Dunkin' could have withdrawn its notices of termination and lawsuit prior to Apostoleres' manifestation of intent to treat the franchise agreements as over.[60] As Professor Williston discusses, "[U]nless the repudiation is withdrawn it operates as a 'continuing offer' of a breach which may be taken advantage of at any time."[61] This court has held,
 
 
 85
 All that is required to close the door to repentance is definite action indicating that the anticipatory breach has been accepted as final, and this requisite can be supplied either by the filing of a suit or firm declaration, as here, that unless within a fixed time the breach is repudiated, it will be accepted.[62]
 
 
 86
 As discussed in part I.A, Apostoleres' counterclaim should be construed as an acceptance of Dunkin's repudiation and termination of the franchise agreements. And as discussed in part I.B, during the course of the proceedings Apostoleres firmly accepted Dunkin's breach as final. Thereafter, the locus poenitentiae ended, and Dunkin' could not retract its repudiation of the parties' agreements. The jury's verdict sealed the matter, awarding Apostoleres the value of the businesses. Dunkin's change of position in agreeing to continue with the contracts following the jury's verdict was predictable but cannot erase its breach of contract by repudiation and Apostoleres' acceptance thereof.
 
 3. Conclusion
 
 87
 Whether due to the inappropriateness of specific performance or Dunkin's anticipatory repudiation, Apostoleres was entitled to recover the full amount of the lost future profits of the franchises.[63]
 
 IV.
 
 88
 By giving effect to Dunkin's post-verdict desire to continue the contract and ignoring Apostoleres' consistently expressed right to elect to terminate the contract, the magistrate judge essentially allowed the offender to select the victim's redress. It is difficult to imagine a greater injustice. This injustice is magnified by the fact that the majority simultaneously must defy the facts of the case and Massachusetts law to affirm the magistrate judge's reduction of Apostoleres' damages. I respectfully dissent.[64]
 
 
 
 [1]
 The magistrate judge tried the case based upon referral from the district court and consent of the parties, as is provided for by statute
 
 
 [2]
 Because other of Apostoleres's family members originally named as parties in the lawsuit failed to file an opening brief, through the clerk of the court, we have dismissed the appeal as to those members. See 11th Cir.R. 42-1(b). Although the corporations Minerva and Rosebud join Apostoleres's appeal, we will refer only to Apostoleres
 
 
 [3]
 Paragraph 17.A of Apostoleres's franchise agreements with Dunkin' reads: "This Agreement shall be interpreted, construed and governed by the laws of the Commonwealth of Massachusetts." The district court ruled that in accord with this provision, Massachusetts law governs the interpretation of the franchise agreements. The parties do not now contend otherwise
 
 
 [4]
 The following exchange occurred between the magistrate judge and Apostoleres's lawyers:
 THE COURT: And are you saying that it was [Apostoleres's] intention all the way along to claim the going value of the business as damages rather than lost profits?
 MR. GARCIA: I can tell you that there were interrogatories answered in the arbitration by the lawyer that was involved in this case before me, okay?
 THE COURT: Well, he said lost business, right?
 MR. GARCIA: Okay. I believe that's correct, whatever Mr. Savitz [Dunkin's lawyer]--
 THE COURT: And it's your contention that that response should have put [Dunkin'] on notice that what you were seeking was the going value of the business?
 MR. GARCIA: No, I don't think that would be fair for me to suggest that, your Honor. I think that what candidly happened is they had an arbitration. There had been no discovery taken. Other lawyers were involved and they answered the interrogatories in that fashion, but I don't know that I have an obligation to educate the other side of the theories of liability and elements of recovery. I mean, that's research as to what--I tell you what we did do, is on June 14th went to Mr. Savitz's office in an attempt to settle the case and educate his clients, and told them here it is, here are our cases, and then followed up with a letter.
 But no, I couldn't fairly represent to the Court that what the lawyer put in those Interrogatory Answers to the arbitration, the other lawyer--
 THE COURT: And I assume then you are not going to show lost profits for the period of time in question, from the notice of termination of the franchise until whatever ending period we have, you do not intend to show that.
 MR. GARCIA: That's right.
 MR. MALLOY: Your Honor, I would like to respond to that just briefly.
 THE COURT: Because as I see it, if I decide that you're not entitled to that measure of damages, then that's it. I mean, there is no alternate theory of recovery here. I'm trying to find that out.
 MR. MALLOY: Your Honor.
 THE COURT: Yes.
 MR. MALLOY: Your Honor, Mr. Raffa at his deposition did testify that he put a factor in for litigation-free environment and I think that would be allowable. As far as these businesses being operated in a litigation-free environment, had this lawsuit not been filed they would have had X percentage of increase in business. He put a factor on that in his deposition, so if you did feel inclined to smack out all the other damages that we are claiming, I think that arguably even under the damages he says that we are allowed to--.
 
 
 [5]
 Because we affirm the judgment n.o.v. as to damages, we need not decide whether the magistrate judge erred in conditionally granting a new trial as to Apostoleres's claims
 
 
 [1]
 See majority opinion, at 1571 ("A fair reading of Apostoleres's counterclaim reveals no indication that Apostoleres brought her lawsuit on the theory that Dunkin' committed breach, and in response to such breach, she wished to stop performance and recover lost future profits.")
 
 
 [2]
 R1-1-4
 
 
 [3]
 R1-5-14
 
 
 [4]
 Id. at 15
 
 
 [5]
 See, e.g., North Am. Financial Group, Ltd. v. S.M.R. Enterprises, Inc., 583 F.Supp. 691, 699 (N.D.Ill.1984) ("[T]here is absolutely no precedent for granting specific performance of a franchise contract. A franchise agreement of the type contemplated here is at least partially a contract for personal services."); Burger Chef Sys., Inc. v. Burger Chef of Fla., Inc., 317 So.2d 795, 797-98 (Fla.Dist.Ct.App.1975). A request for specific performance of a franchise contract should be distinguished from a request for specific performance of a contract for the sale of a franchise, which may be granted. See Triple-A Baseball Club Assocs. v. Northeastern Baseball, Inc., 832 F.2d 214, 222-25 (1st Cir.1987), cert. denied, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988)
 
 
 [6]
 At a minimum, Dunkin's breach of contract has cost Apostoleres approximately $250,000 in attorney's fees and costs
 
 
 [7]
 Robinson v. Lorillard Corp., 444 F.2d 791, 803 (4th Cir.1971) (footnote omitted); see also Scutieri v. Paige, 808 F.2d 785, 790-93 (11th Cir.1987) (under Rule 54(c), unnecessary for plaintiffs to specifically request punitive damages in pleadings). See generally 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2664, at 146 (1983) ("If defendant has appeared and begun defending the action, adherence to the particular legal theories of counsel that may have been suggested by the pleadings is subordinated to the court's duty to grant the relief to which the prevailing party is entitled, whether it has been demanded or not." (footnote omitted))
 
 
 [8]
 Robinson, 444 F.2d at 803; see also Albemarle Paper Co. v. Moody, 422 U.S. 405, 424-25, 95 S.Ct. 2362, 2374-75, 45 L.Ed.2d 280 (1975); Sapp v. Renfroe, 511 F.2d 172, 176 n. 3 (5th Cir.1975)
 
 
 [9]
 See Robinson, 444 F.2d at 803 (finding no prejudice to opposing party); Sapp, 511 F.2d at 176 & n. 3 (same)
 
 
 [10]
 See majority opinion, at 1571 ("Apostoleres never pleaded relief seeking to terminate or rescind the franchise agreements.")
 
 
 [11]
 See majority opinion, at 1572; R2-49-6 ("Defendants' Answers to Standard Arbitration Interrogatories")
 
 
 [12]
 R2-87-Exh. A, at 4
 
 
 [13]
 See, e.g., R2-87-13 ("[T]he greatest portion of Defendants' damages in this case is the loss of the franchises for the remainder of the franchise periods. Essentially, that translates to be the value of the two franchises.")
 
 
 [14]
 R3-112-Exh. I
 
 
 [15]
 R4-134-6
 
 
 [16]
 R5-210
 
 
 [17]
 See majority opinion, at 1572 & n. 4
 
 
 [18]
 R10-23 (transcript of pretrial conference, Sept. 13, 1989)
 
 
 [19]
 Corbin on Contracts quotes an old Massachusetts case on this issue: "[Specific performance and damages for total breach] are alternative remedies but are not inconsistent; and remedy in both forms might be sought in one and the same action. If the plaintiff institute[s] separate actions he cannot carry both to judgment and satisfaction. He may be compelled, by order of the court, at any stage of the proceedings, to elect which he will further prosecute." 5A A. Corbin, Corbin on Contracts, § 1222, at 476 n. 47 (1964) (quoting Connihan v. Thompson, 111 Mass. 270 (1873))
 
 
 [20]
 See Friederichsen v. Renard, 247 U.S. 207, 213, 38 S.Ct. 450, 452, 62 L.Ed. 1075 (1918) ("At best this doctrine of election of remedies is a harsh, and now largely obsolete rule, the scope of which should not be extended....")
 
 
 [21]
 5A A. Corbin, supra note 19, § 1220, at 461-65 (footnotes omitted; emphasis added); see also G. Douthwaite, Attorney's Guide to Restitution § 9.6, at 395-96 (1977) ("Modern courts disfavor election of remedies as a defense unless either the plaintiff's conduct has resulted in prejudicial reliance of some sort by the defendant, or the policy requiring some finality to litigation, usually expressed in the doctrine of res judicata, calls for such a result; or where not to hold plaintiff as having made a conclusive election might tend to facilitate a double recovery." (footnotes omitted))
 
 
 [22]
 18 Mass.App.Ct. 294, 464 N.E.2d 1381 (1984)
 
 
 [23]
 See 464 N.E.2d at 1386-87 ("We perceive no change of position by [defendant] resulting from the [plaintiffs'] efforts to enforce the 1972 agreement which should estop them in 1976 to attempt to set aside the 1972 mortgage as an alternative remedy by way of substitution for or amendment of their earlier contempt complaint.")
 
 
 [24]
 Id., 464 N.E.2d at 1386 n. 14
 
 
 [25]
 Id. (citations omitted)
 
 
 [26]
 The majority cites Kass v. Todd, 362 Mass. 169, 284 N.E.2d 590, 593-94 (1972), for the proposition that continued performance of a contract bars recovery under a theory of quantum meruit. There is no conflict between Kass and the subsequent holding of Plunkett that an estoppel must be created before a remedy will be held to have been elected. Kass held that the injured party could only recover the amount due under the contract, as the contract had been substantially completed. Id., 284 N.E.2d at 594. Here, the contracts have not been fully performed, and Apostoleres simply wishes to be put in the same position she would be in if the contracts had been fully performed
 
 
 [27]
 Restatement (Second) of Contracts, § 378, at 228 (1981); see also id. (comment a; "A change of position is 'material' within the meaning of this Section if it is such that in all the circumstances a shift in remedies would be unjust.")
 
 
 [28]
 See, e.g., Barbe v. Villeneuve, 505 So.2d 1331, 1332 (Fla.1987) ("The election of remedies doctrine is an application of the doctrine of estoppel and operates on the theory that a party electing one course of action should not later be allowed to avail himself of an incompatible course." (citations omitted)); Monmouth Pub. Schools v. D.H. Rouse Co., 153 Ill.App.3d 901, 106 Ill.Dec. 608, 610-11, 506 N.E.2d 315, 317-18 (1987) (election of remedies depends upon estoppel); Litton Indus. Credit Corp. v. Catanuto, 175 Conn. 69, 394 A.2d 191, 193 (1978) (same); Newark Paraffine Paper Co. v. Dugan, 162 N.J.Super. 575, 394 A.2d 114, 115-16 (1978) (same); Johnson v. Dave's Auto Center, Inc., 257 Or. 34, 476 P.2d 190, 193 (1970) (same); id., 476 P.2d at 195 (citing cases from other states); see also, e.g., North Am. Graphite Corp. v. Allan, 184 F.2d 387, 389 (D.C.Cir.1950) (citing state law cases; "The doctrine of election of remedies ... seeks to prevent a party from shifting his position inconsistently. Since it is rooted in estoppel, the doctrine is not available as a defense unless the defendant has materially changed his position as a consequence of plaintiff's previous conduct." (citations omitted)); 5A A. Corbin, supra note 19, § 1220, at 461 n. 31 (citing cases)
 
 
 [29]
 See Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 408 N.E.2d 1370, 1375 (1980) (applying by analogy provisions of U.C.C. to franchise agreement)
 
 
 [30]
 U.C.C. § 2-703, comment 1. See Cesco Mfg. Corp. v. Norcross, Inc., 7 Mass.App.Ct. 837, 391 N.E.2d 270, 274 (1979) (quoting commentary to U.C.C. § 2-703)
 
 
 [31]
 543 F.2d 1306, 211 Ct.Cl. 222 (1976)
 
 
 [32]
 I note that the language from Cities Service Helex quoted by the majority at p. 1571 of their opinion does not refer to the standard for determining whether a remedy has been elected, but actually refers to the standard for determining whether an anticipatory breach of contract has occurred. See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 603 (6th Cir.1988) (quoting identical language and stating, "The rule regarding anticipatory repudiation, also called anticipatory breach, was clearly delineated by the Court of Claims in Cities Service Helex." (citation omitted)). To the extent the majority's quotation from Cities Service Helex refers to the election of remedies doctrine, the quotation seems to set out an approach to election of remedies that the majority does not rely upon (that is, any continued performance forecloses a claim for total breach of contract)
 
 
 [33]
 Id., 543 F.2d at 1313
 
 
 [34]
 Id., 543 F.2d at 1315-16
 
 
 [35]
 Id., 543 F.2d at 1314 ("Some courts have shared Professor Corbin's view that an election should not be conclusive unless facts giving rise to an estoppel exist; either the breaching party must have changed his position in reliance on the injured party's failure to cancel or the injured party's conduct must be such that it would be unjust to allow him to change his position." (citations omitted))
 
 
 [36]
 See id., 543 F.2d at 1317 (finding estoppel due to, inter alia, plaintiffs' actions in securing an injunction against termination of the contracts)
 
 
 [37]
 Cellucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 320 N.E.2d 919, 923 (1974) (internal quotations and citations omitted), aff'd, 368 Mass. 811, 331 N.E.2d 813 (1975); see also Harrington v. Fall River Housing Auth., 27 Mass.App.Ct. 301, 538 N.E.2d 24, 30 (1989)
 
 
 [38]
 Majority opinion, at 1572
 
 
 [39]
 R17-29
 
 
 [40]
 Northern Helex Co. v. United States, 455 F.2d 546, 551, 197 Ct.Cl. 118 (1972)
 
 
 [41]
 See Burnham v. Mark IV Homes, Inc., 387 Mass. 575, 441 N.E.2d 1027, 1034 (1982) ("The general rule with respect to mitigation of damages is that a plaintiff may not recover for damages that were avoidable by the use of reasonable precautions on his part." (citation omitted)); see also 11 S. Williston, A Treatise on the Law of Contracts § 1302, at 84 (W. Jaeger 3d ed. 1968) ("It need not be contended that in every case the principle of [mitigation of damages] will deprive the plaintiff of the right to continue performance of the contract after it has been repudiated. There may be cases where so doing will not needlessly enhance damages, and it is a question of fact in every case whether such enhancement of damage will be caused." (footnote omitted))
 
 
 [42]
 See, e.g., Harrington v. Fall River Housing Auth., 27 Mass.App.Ct. 301, 538 N.E.2d 24, 29 (1989) ("Estoppel is an equitable doctrine created to prevent one from benefiting from his own wrongdoing and to avoid injustice." (citations omitted)); Thompson v. Soles, 299 N.C. 484, 263 S.E.2d 599, 602 (1980) ("The doctrine of estoppel rests upon principles of equity and is designed to aid the law in the administration of justice when without its intervention injustice would result." (citations omitted)); Johnson v. Dave's Auto Center, Inc., 257 Or. 34, 476 P.2d 190, 195 (1970) ("[T]he doctrine of election of remedies does not become conclusive upon the receipt of any benefit by the plaintiff or the suffering of any detriment by the defendant, but only where plaintiff has been benefitted by being 'unjustly enriched' or by acquiring some 'unfair advantage' over defendant or when defendant has been actually misled by plaintiff's conduct or has suffered detriment in reliance upon or as the result of such conduct so as to involve an inequitable result.... [T]he trend of decisions [is] to limit the doctrine of election of remedies so as not to become an 'instrument of injustice,' and so as to become an application of the doctrine of estoppel." (emphasis in original; citations omitted)); supra note 27 (applicability of Restatement test for election of remedies depends on whether the requested shift in remedies is "unjust")
 
 
 [43]
 See, e.g., Trausch v. Knecht, 184 Neb. 134, 165 N.W.2d 738, 742 (1969) ("Estoppel cannot arise where all parties interested have equal knowledge of the facts, or where the party setting up estoppel is chargeable with notice of the facts, or is equally negligent or at fault." (citations omitted)), vacated on other grounds, 184 Neb. 511, 169 N.W.2d 269 (1969)
 
 
 [44]
 Hampshire Arms Hotel Co. v. St. Paul Mercury & Indem. Co., 215 Minn. 60, 9 N.W.2d 413, 415 (1943) (citation omitted)
 
 
 [45]
 R6-220-11 (citation omitted)
 
 
 [46]
 Id. at 13
 
 
 [47]
 See, e.g., National Medical Care, Inc. v. Zigelbaum, 18 Mass.App.Ct. 570, 468 N.E.2d 868, 876 (1984) ("The measure of damages recoverable by an employee wrongfully discharged before the expiration of an employment contract is the wages he would have earned under the contract less what he did in fact earn or in the exercise of proper diligence might have earned in another employment." (citations and internal quotations omitted))
 
 
 [48]
 See supra note 5 and accompanying text
 
 
 [49]
 Cf. Lawless v. Melone, 350 Mass. 440, 214 N.E.2d 881, 882 (1966) (affirming trial court's refusal to order specific performance of joint venture; "Lawless and Melone had been engaged in litigation with each other and to have each of them own one half of the capital stock in a small corporation would be likely to result in an unsatisfactory and probably unworkable arrangement.")
 
 
 [50]
 Restatement (Second) of Contracts § 253(1) (1979). See generally City of Fairfax v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1325-28 (4th Cir.1978) (discussing elements of anticipatory repudiation of contract), cert. denied, 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979)
 
 
 [51]
 Restatement (Second) of Contracts § 236(a) (1979)
 
 
 [52]
 See Daniels v. Newton, 114 Mass. 530, 19 Am.State Rep. 384 (1874); see also Petrangelo v. Pollard, 356 Mass. 696, 255 N.E.2d 342, 346 (1970) ("The words and actions of the defendants amounted to more than a mere anticipatory breach for which recovery would be denied under the rule of Daniels v. Newton, 114 Mass. 530."). See generally Prance, Anticipatory Repudiation of Contracts: A Massachusetts Anomaly, 67 Mass.L.Rev. 30, 30 (1982) ("[T]he doctrine of anticipatory breach or, more accurately, breach [by] virtue of anticipatory repudiation, ... has been accepted in every jurisdiction of the United States except the Commonwealth of Massachusetts, and has been adopted by both editions of the Restatement of Contracts." (footnote omitted))
 
 
 [53]
 Prance, supra note 52, at 33; see also Petrangelo, 255 N.E.2d at 346 (statement of repudiation accompanied by failure to make payments created cause of action); Carrig v. Gilbert-Varker Corp., 314 Mass. 351, 50 N.E.2d 59, 62 (1943)
 
 
 [54]
 Mass.Gen.Laws Ann. ch. 106, § 2-610
 
 
 [55]
 See Prance, supra note 52, at 34
 
 
 [56]
 Daniels v. Newton, 114 Mass. at 541; see also Prance, supra note 52, at 32
 
 
 [57]
 Mobley v. New York Life Ins. Co., 295 U.S. 632, 638, 55 S.Ct. 876, 878, 79 L.Ed. 1621 (1935) (citations omitted)
 
 
 [58]
 See, e.g., Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 173 A.2d 258, 265 (1961) (franchisor's declaration that it could not prevent its agent from inflating price of supplies went to the "essence of the contract" and amounted to an anticipatory breach)
 
 
 [59]
 Roehm v. Horst, 178 U.S. 1, 13, 20 S.Ct. 780, 785, 44 L.Ed. 953 (1900) (quoting Johnstone v. Milling, 16 Q.B.D. 467, 472)
 
 
 [60]
 See Restatement (Second) of Contracts § 256 (1979)
 
 
 [61]
 11 S. Williston, supra note 41, § 1321, at 129 (footnotes omitted)
 
 
 [62]
 United States v. Seacoast Gas Co., 204 F.2d 709, 711 (5th Cir.), cert. denied, 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377 (1953); see also Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 604 (6th Cir.1988); cf. Farmers & Bankers Life Ins. Co. v. St. Regis Paper Co., 456 F.2d 347, 350 n. 2 (5th Cir.1972) (interpreting Texas law; "F & B contends that no election of remedies is necessary until time of trial. This is ordinarily true. Only if the failure to elect is relied upon by the repudiator or if the repudiation is withdrawn prior to acceptance is the innocent party normally bound. Efforts to induce the defaulting party to perform its contract do not waive the offered breach." (citations omitted))
 
 
 [63]
 See Knightsbridge Marketing Servs., Inc. v. Promociones Y Proyectos, S.A., 728 F.2d 572, 575 (1st Cir.1984) ("Under Massachusetts law, lost profits are a proper element of recovery in an action for breach of contract....")
 
 
 [64]
 When the magistrate judge entered the order granting judgment n.o.v., she also conditionally granted Dunkin's motion for a partial new trial on Apostoleres' counterclaim, should the judgment n.o.v. be reversed on appeal. The magistrate judge took this action because "the jury verdicts for defendants on their counter-claims for breach of contract are clearly contrary to the great weight of the evidence." R6-232-3. However, the magistrate judge reached this conclusion only because she determined that there was no connection between Apostoleres' damages and the jury's award. Because I believe Apostoleres could have been awarded the lost profits of the franchises under the specific performance or anticipatory repudiation theories, I would also reverse the magistrate judge's conditional grant of a new trial